CINCINNATI CITY v. MORGAN.

1. The properly constituted authorities of a municipal corporation may bind the corporation whenever they have *power* to act in the premises.
2. To acquire, as against all mortgagees and incumbrances, a lien by statute upon the *corpus* of a railroad, in virtue of credit advanced, it is necessary that the statute express in terms not doubtful the intention to give

a lien. The fact that, on one side, by not making a particular clause in the statute operate as a lien on the road, you leave it but declaratory of ordinary law, is not enough to give a lien, when, on the other, by making the clause so operate, you would give one where the parties have declined to *take one in ordinary form* and contracted for a pledge of the *capital stock* of the road.

*Ex. gr.* The Ohio legislature, authorizing the City Council of Cincinnati to issue its bonds for $1,000,000 to a certain railroad, enacted:

"That it shall be the duty of the said City Council, and it is hereby authorized, to contract with the said company, to secure, by mortgages, transfers, or *hypothecations of stock* of said company, *or* by such *other liens or securities*, real or personal, as may be mutually agreed on, the payment of the amount of the principal of such bonds as may become due, and for the reimbursement of the interest upon the same, which shall have been paid by the city; *and for the further purpose of the securing the city against all loss or losses which the same may suffer, whether by the payment of the said principal or interest, or any damages arising therefrom, that the above described liens, mortgages, or other securities, shall have priority or precedence of all claims or obligations subsequently contracted by such company, and over other liens, securities, or mortgages which were not duly entered into between the company and other persons, before the respective issues and loans aforesaid.*"

The city, having first resolved, as a popular vote had apparently contemplated that it should do, to lend its bonds on a mortgage of "*the property of the company*," took afterwards a hypothecation, mortgage, and pledge of twenty thousand shares of its "*capital stock.*"

*Held*, that neither by the terms of this statute, nor by certain other statutes, relied on as helping out the lien, nor in any other way, was a lien on the *road* given to the city as against subsequent mortgagees.

By an act passed by the legislature of Ohio, 20th March, 1850, the city of Cincinnati was authorized to issue its bonds to the amount of $1,000,000, to be lent to the building of railroads terminating in the city, or to be subscribed to their capital stock, on a vote of the qualified voters of the city, and of the City Council. The Ohio and Mississippi was one of these roads. A vote was obtained in favor of this railroad company, agreeing to the issue of bonds to the amount of $600,000 of the city, to be secured by a mortgage upon such property of the company as the City Council should require.

The seventh section of this act of 1850 provided, in substance, as follows:

"That it shall be the duty of the said City Council, and it is hereby authorized, to contract with the said companies, to secure, ny mortgages, transfers, or hypothecations *of stock* of said com-

pany, or by such *other liens or securities, real or personal,* as may be mutually agreed on, the payment of the amount of the principal of such bonds as may become due, and for the reimbursement of the interest upon the same, which shall have been paid by the city; and for the *further* purpose of the securing the city against *all* loss or losses which the same may suffer, whether by the payment of the said principal or interest, or any damages arising therefrom, that the above-described liens, mortgages, or other securities shall have *priority or precedence* of *all* claims or obligations *subsequently* contracted by such company, and over other liens, securities, or mortgages which were not duly entered into between the company and other persons, *before* the respective issues and loans aforesaid."

The ordinance of the city in respect to the security for its loan, as above authorized, was thus:

" That before the bonds, or any part thereof, shall be delivered over to the said company, it shall mortgage, hypothecate, pledge, and deliver to the city, $1,000,000 of the capital stock of said company, under seal, and shall authorize the City Council to sell and dispose of so much of the stock as will realize the aforesaid sum of $600,000; said stock to be sold at such times, in such sums, and upon such terms as the City Council may determine; and appropriate the proceeds in such manner as the same may direct."

The terms mentioned in this ordinance were assented to by the company, and a certificate was duly issued, stating that the City of Cincinnati "is the owner of twenty thousand shares of the capital stock in the Ohio and Mississippi Railroad Company, transferable on the books of the company, at the Cincinnati office, upon surrender of this certificate." The certificate was indorsed:

"This stock is issued, mortgaged, hypothecated, and pledged to the City of Cincinnati, as security for the loan of the bonds of the city for $600,000," &c.

This certificate of stock was accepted by the City Council and deposited with the City Treasurer, and bonds of the city

were soon after issued to the company to the amount of the $600,000.

Subsequently to this transaction the railroad company made different mortgages of their road and its fixtures, and a bill of foreclosure having been filed under one of them—the second—and the City of Cincinnati made a party defendant, the city put in an answer, alleging, among other things, that she had lent to this railroad company her bonds to the amount of $600,000, and had a lien on the road as security paramount to any mortgage. This was denied by the holders of the bonds under the second mortgage, and, whether the city had or had not such a lien, was the question.

To understand the argument made here by the city's counsel, and which sought to support the lien, if support was wanted, by reference to other statutes of Ohio, it may be necessary to add:

1st. That prior to the date of these transactions, or of the act of 20th March, 1850, there was a law in force in Ohio, known as the General Railroad Law. This law—the provisions of which, it was said, had been extended to the Ohio and Mississippi Railroad (originally incorporated in Indiana)—gave power, by its 13th section, to railroad companies to borrow money, and to execute bonds or notes therefor; and in order to secure the payment thereof, to pledge their property and income; "provided," the act went on to say, "that the value and security of any liens, mortgages, or the stock held in or *against* such company *by the State or the City of Cincinnati*, should not thereby be injured or otherwise impaired."

2d. That subsequent to the act of March 20th, 1850, an act of February 10, 1851, authorizing the city to subscribe to another railroad—the Cincinnati Western—was passed; which act contained, in one of its sections—the 15th—exactly the same language as has been presented, *supra*, pp. 276–7, as making the 7th section of the act of March 20th, 1850, now under consideration, but contained, *in addition*, the following as its 16th section:

"That the City Council of the City of Cincinnati shall not lend

her credit or issue her bonds to this or any other railroad com-pany, unless the *private stockholders mortgage a sufficient amount of real estate, in addition to the road and other effects of said com-pany or companies, as security for the lending of her credit or issuing of such bonds by said city."*

Certain other incidents of the case may be mentioned; as,

1. That the original proposition made by the City Councils to the people, to be voted on, was whether the city should issue the $600,000, to " be secured by a *mortgage* upon such property of *the company* as the City Council shall require," and that this was the question voted on.

2. That when, after the popular vote authorizing the loan of the city's credit, the city directed its president of council to execute, issue, and deliver the bonds to secure the said loan, it did so reciting the loan as one "which shall be by mortgage *on* the said road."

3. That subsequently to this date another ordinance was passed:

" That so much of the before-recited ordinance as requires the loan of $600,000 to said company, to be secured by a mortgage on said road, be hereby repealed; provided, that before the bonds, or any part thereof, shall be delivered over to said com-pany, the said company shall mortgage, hypothecate, pledge, and deliver to said City of Cincinnati, one million of dollars of *the capital stock* of said company, under seal, authorizing the City Council to sell and dispose of so much of the stock as will realize the aforesaid sum of $600,000; said stock to be sold at such times, in such sums, and upon such terms as the City Council may determine, and appropriate the proceeds in such a manner as said council may direct; provided further, that said company shall oblige itself, by writing under seal, in case of failure to pay interest upon said loan, to transfer to said City of Cincinnati a sufficient amount of the capital stock of said com-pany, with authority to sell the same, as will realize the amount of interest unpaid."

The court below—considering that the pledge was but of *certificates of stock*, one of the forms of security allowed by the 7th section of the act of 20th March, 1850, and that

neither the 13th section of the general law incorporating railroads, nor the 16th clause of the act of February, 1851, incorporating the Cincinnati Western Railroad Company, and which required a pledge of the private property of the stockholders applied to the case—decreed that the city had no lien whatever on any property of the railroad, except upon the stock pledged to it. And an appeal was now here.

*Mr. Stanbery, for the city:* Has the city a lien on the road in this case?

I. We submit that the 7th section of the act of March 20th, 1850, on its own face gives it. This section makes it the *duty*, and authorizes the City Council to *secure* the payment of the principal and interest of these bonds. The sole purpose of this section was *security* to the city for the bonds to be issued. The section does not stop with the clause, giving a choice as to the nature of the security. It proceeds to declare, that for the "further purpose of securing the city" from *all* loss or damage, the *security given* shall have priority over *all* claims, liens, mortgages, or securities, subsequently created.

Effect must be given to this part of the section. It must be taken into the account and receive a construction; or, rather, to state the point more accurately, *the whole* section must be construed, and every clause be made to operate.

The council first fixed upon a mortgage on the *road* as the form of security, and the popular vote ratified the loan upon that basis; the company accepted the loan upon the same basis, and afterwards the council dispensed with security by mortgage, and accepted an hypothecation of stock. This was one of the forms of security named in the 7th section.

Will it be argued, that upon this change a lien upon the stock was substituted for a lien upon the road, and that to make the lien operate on the road also, under the subsequent clause, frustrates the election as to the form of security given

in the first clause? or argued, that the priority of lien provided for in the last clause, means only a priority over the securities of a like kind with the one adopted under the first clause? This construction, if tenable, would, indeed, harmonize the entire section; but it is not tenable.

In the first place, there was no necessity for such a provision, for either form of security taken under the first clause would necessarily have precedence over a subsequent security upon the same subject-matter.

In the next place, that construction does not cover all the terms of the last clause, for the priority is not confined to other liens, whether like or unlike the security taken, but extends as well to *all* claims or obligations, without lien, subsequently contracted.

Undoubtedly, as to claims without lien, this clause gives to the city precedence over them all, not only as to the stock hypothecated, but as to all other property of the company. The clause does not apply merely to precedence over the thing pledged; for those creditors had only a right to look to so much of the property as was not pledged, or if to property incumbered, subject to the incumbrance.

There are other reasons why this construction cannot be allowed.

Let us first consider the subject-matter. It is a loan of the credit of the city in the form of bonds, payable as to principal at a distant day, and as to interest semi-annually. No money is lent. No debt arises in favor of the city and against the company in the beginning. The parties stand in the relation of principal and surety, and not of debtor and creditor. But whenever the liability should accrue, and the city be obliged to advance money upon the default of the company to meet an instalment of interest, a debt would arise for which the city would require prompt payment, or the means of enforcing prompt payment. Eventual indemnity, by the slow process of judicial proceedings, would not meet the emergency. It was, therefore, natural and proper that, in addition to eventual indemnity, provision should be made in some other form for prompt protection.

Now, consider in this light the various provisions made in this seventh section.

The council is, in the first place, required to take security for the payment of the bonds as they become due, "and for the reimbursement" of interest which may have been paid by the city. It could not have been the intention of the legislature to leave the city with nothing to rely upon but personal security for a liability so large, and extending through a period of thirty years. Nor if the protection of the city was to be limited to the exact scope of the security to be taken, would we look to find so important a matter left wholly to the discretion of the City Council. But when we consider this clause as more especially intended for *prompt* protection—as for the reimbursement of interest paid by the city—then it seems reasonable, nay very wise, that full discretion should be left to the council to select, through the whole range of securities real or personal, that form which would be most ready and available. One can see, that for this purpose a pledge of stock, with power to realize by sale, is the most desirable and available form of security. There is an open market for *it*, though seldom for a large mortgage.

Next consider the phrase with which the second clause of the section commences, "and for the *further* purpose of *securing* said city against *all* loss or losses." This language carries the idea of a security additional to that provided for in the first clause. Is it satisfied by a construction which gives no further security? Or which merely declares the legal effect of the security already given? It comprehends all risks which the city may run upon the footing of its loan. It means full indemnity. Then follows, in language just as ample and as comprehensive, the provision for such indemnity. This is a priority or precedence in favor of the city, from the date of the loan or issue of bonds, over all other parties and all other forms of security subsequently contracted. It is a priority from the date of the "issues and loans," not from the date of the particular security. The actual *loan* or *issue* of credit is the very thing covered by the indemnity and

upon which the indemnity comes into operation. This construction is the only one which gives effect to the whole section, and at the same time leads to no repugnancy, and to no superfluous or illusory results.

It would seem that the City Council understood the section according to this construction. They first elected to take security by a mortgage of the road, and to this the company assented. Then, so far as appears upon its own motion, the council required an hypothecation of stock rather than a mortgage. Undoubtedly, as a means to reimburse the city promptly for advances in payment of interest, the substituted security was the best; but, as a permanent fund to hold for eventual indemnity against the payment of the principal to fall due after the lapse of thirty years, it was wholly untrustworthy, and subject to indefinite depreciation by the intervention of subsequent liens.

The City Council, it must be remembered, were exercising a strict statutory authority. They could dispense with nothing required by the statute, and exercise no discretion except that conferred by it. They could do nothing without the popular vote and do nothing contrary to it. But the popular vote authorized a loan with security by mortgage of the road. The exact question submitted and voted upon was, whether the city should issue the $600,000 to be secured in this way. The railroad company on its part expected also to give a mortgage. Now if we so construe this section as to hold that after the popular vote in favor of a loan which gave a lien on the road, that lien was lost by the act of the council in the substitution of another form of security, we take from the people who incur the liability the protection upon which they relied, and allow these public agents to commit a fraud on their constituents.

II. The 13th section of the General Railroad Law, then in force, supports our idea. The reader will please to turn back and read the language of its proviso, at page 278. Does he not perceive, on reading it, that the legislature intended to guard the interest of the city as carefully as that of the State, and to preserve the value of the stock held *in* or *against* a

company, by either the State or the city, from loss by sub-sequent liens? Stock held "*against*" a company, in contra-distinction to that held *in* a company, can only mean stock held as a pledge or security, precisely as we assert that the stock is held by the city under the pledge in this case. If this proviso is operative, it must follow that the city stands first; for, to postpone it to the subsequent mortgages, not only impairs but destroys the value of the stock as a security. The reason for this peculiar favor to the city is evident. This city, the great centre of population and wealth, to which nearly all the roads of the State tended, and where a great number of them terminated, required such protection from the magnitude of the liabilities it would be expected to incur.

The 16th section of the act " to incorporate the Cincinnati Western Railroad Company," and authorizing the city to subscribe to *it*, passed February 10, 1851, and to whose lan-guage the reader will also turn back, is even more to our purpose. It requires the private stockholders to mortgage a sufficient amount of real estate, *in addition to the road and other effects of their company*, as security for the lending of the city credit.

The point which we make upon this act is, that it gives us a legislative construction of the 7th section of the act under which our loan was made. It stands free from doubt that the legislature considered the 15th section of this act identical with our 7th, as giving the city all the *corporate* security which could be given. But, beyond that, and lest it all might not give the *full indemnity* that was required, the private property of stockholders was also pledged. The individual security is declared to be cumulative, " in addi-tion to the road and other effects of the company." Does not this carry irresistibly the idea of provision already made for a lien on all the corporate property, road, and everything else?

The only difference between the two acts is this, that, by the act of 1850—our act—the legislature was satisfied with all the corporate property as a measure of indemnity; whereas,

in the act of 1851, they were not satisfied with that alone, but required individual property besides.

III. The city has a lien upon the other corporate property through the pledge of stock.

When the stock was hypothecated, all the property of the company was free from any other pledge or incumbrance. Suppose at that time, and before any sale of the stock under the pledge, the company had been forced into liquidation—certainly the city would have stood in priority over stockholders—it would then have a priority not incident to common stock. It may be answered to this, that the lien would then arise upon the debt and in favor of the city as a creditor merely. But take it that other creditors were to be provided for. Would the city be entitled to no priority over them upon the footing of the pledge?

A surplus remaining after the mortgages are satisfied, or over property, if there is any, not included in those mortgages, would have no beneficial results. It is clear that if the mortgages are to be first satisfied everything will be swept away. The city claims, however, under this point a reversal, on the ground that the city stands now, as it stood when the pledge was made, prior in time and prior in lien upon the corporate property, to all other incumbrances. We assert that, under the circumstances of *this pledge, that* is its scope and effect, aside from the further provisions contained in the 7th section giving full indemnity; or that such is the effect of the pledge, *as a pledge,* according to all the provisions of this section, which, *quoad hoc,* give it that effect.

Finally. What is the stock of a road or of a bank but the effects and property of the road or bank? If the road or bank is prosperous, and makes great profits, those profits pass to the holders of the stock; they are accretions to or on their property. The shares are but the proportions in which the whole is held.

*Messrs. Coffin, Evarts, and T. G. Mitchell, contra:* If there exists a lien on the road in this case, it is one of a new kind;

a lien not by statute, nor by common law, but "a lien by argument." And though the bar generally would admit, if "liens by argument" can exist at all, that Mr. Stanbery is as able to create a good one as any man living, we must deny even to him the privilege of creating for them that which the parties had no design of creating for themselves.

The act of March 20, 1850, authorizes the city to contract with the railroad companies to which it may make loans, in reference to the character of the security to be given for them; and enumerates mortgages, transfers, or hypothecations of stock, and other liens and securities, real or personal, as those which may be thus agreed upon. This provision, it is conceded, would be sufficient to vest in the City Council the complete control of the subject of security but for the subsequent clause of the same section, enacting that the liens, mortgages, or other securities, so received, shall have priority over all obligations subsequently contracted by the companies, and over all other liens not acquired by other persons, prior to the issue and loan by the city of its bonds; which latter clause, it is asserted, makes the loans of the city, no matter what specific security may have been agreed upon, liens upon all the property of the respective companies, from the dates of the several loans. The construction would make the legislature provide that the city might elect to take whatever security it should select, real or personal, by pledge of stock, mortgage of specific property, or of any other description, but that the result must be in every event the same.

The statement of this argument appears to carry with it its refutation; and nothing but the eminence of the counsel by whom it is advanced entitles it to consideration.

The construction can be sustained only by rendering the whole provision as to the discretion vested in the City Council substantially inoperative, in order to rid the subsequent clause of the charge of being useless. In any event, too, it must be borne in mind that the clause relied upon does not in terms, nor even by implication, provide that the claims of the city shall be liens upon the roads of the companies,

nor upon any other specific thing whatever. The law provides that the City Council may stipulate for such security as it pleases; and it then, perhaps unnecessarily, enacts that whatever security it does take shall have priority over all other subsequent claims. It certainly does not provide that any security, by personal indorsement, or by pledge of stock, shall operate as a mortgage upon a railroad. And it would be an extraordinary judicial interpretation which would inject such a provision into the act, in order to shield a portion of its language from the charge of having been unnecessarily employed.

We all know that it is not an unusual thing to find in the legislation of this country unnecessary provisions and useless repetitions. And while the general principle of construction relied upon in this case may be admitted to be correct when there is a proper occasion for its application, the court—in order to avoid the conclusion that the General Assembly of Ohio has enacted that a lien shall have priority over subsequent liens—will not decide that nothing was meant by the expressed provision vesting the City Council with an absolute discretion; nor that when there was an intention to give a specific lien upon the tracks of railroad companies and their appurtenances, it was not thought necessary to mention, or even to allude to, that species of property.

The idea is presented by opposite counsel, though not largely or very specially enforced, that whatever discretion was vested in the City Council was exhausted by the passage of the resolutions (see *supra*, page 279) submitting the question of loans to the voters of the city; that the acceptance by the railroad company of the terms of these resolutions, one of which, it is argued, stipulated for a mortgage of the road as security, completed a contract for a lien upon the road; and that after the vote of the people, and the completion of a contract in pursuance of it, the City Council had no power to change the security.

But how can the power, explicitly conferred upon the City Council, to decide upon the security to be exacted, be

exhausted before the passage of the ordinance for the issue of the bonds to be lent? It was made the duty as well as the right of the council to decide upon this question; and even if there had been submitted to the people the question of making a loan, on the faith of a particular indemnity, the council would by no means have precluded itself from insisting upon what was deemed a better security, before making the loan. If the question were open, whether the security taken was in fact superior to the one originally proposed, it would not be difficult to show that it at least was not inferior; since a mortgage upon a merely hypothetical road, would not only be useless until the road was constructed, but would itself be an obstacle in the way of such construction. But that question is not open. The properly constituted authorities of a municipal corporation, as well as the managers of any other corporate body, may bind the corporation by acts in contravention of their plain duty, and even in direct violation of law, whenever they have any power to act at all in the premises. " Where the directors of a company," says an English case,* " do acts in violation of their deed, in a matter *in which they have no authority*, such acts are altogether null and void. But when acts to be done are within the power and duty of the directors and are neglected, and thereby third parties are damaged, neither a court of law nor of equity, will allow the company to take advantage of that neglect. . . . . If a company neglect a form or an obligation, which they could and ought to perform, they cannot afterwards raise an objection of that want of form, as against a person with whom they have been dealing."

If it were true, however, that the City Council had no power to dispense with the original provisions of its resolutions, and that those resolutions required from this company a mortgage, and that the city remained entitled, as against the railroad company, to the mortgage at one time contemplated, the fact would nevertheless remain, that no mort-

---

* Bargate *v.* Shortridge, 31 English Law and Equity, 44.

gage was ever executed in pursuance of this agreement; and no claim based on one could be asserted, as against the holders of mortgages regularly executed. The city, of course, is not here attempting to deny the validity of its bonds.

II. Support of the kind desired by the city is thought to be derived from other statutes; the general railroad law, for example, and the act to incorporate the Cincinnati Western Railroad. This mode of interpreting statutes,—a mode by which one statute is made to mean, that which some other, and not *it*, enacts—is a dangerous mode of expounding laws. As a means of *interpreting* any act, it is hardly allowable. With an example set, we may, however,. perhaps refer to statutes to show that when the legislature of Ohio has meant to create a specific lien on anything,. it knew the proper words by which to do it. Thus by an act of March 24, 1837,* " To authorize a loan of credit by the State of Ohio to railroad companies," &c., the legislature,. after enacting that certain railroads shall be entitled to a loan of credit from the State equal to one-third of their authorized capital, and that certain officers of the State shall deliver negotiable scrip or transferable certificates bearing interest of the State to every such company, goes on to say :

" The receipt of such scrip, or any portion of scrip, by any railroad company, shall operate *as a specific pledge of the capital stock, estate, tolls, and profits* of such railroad company, to the State of Ohio, to secure the repayment of the sums advanced."

Indeed in all cases where lien by statute is meant to be created the legislature has taken care to express the intention to create the lien in clear and explicit terms. For certain trespasses committed by the navigators of canal-boats, the party injured, for the damages sustained " shall have *a lien*" upon the boat.† For labor or materials furnished, &c., the party " shall have *a lien*."‡ Mutual insurance companies insuring buildings, for payment of the assessments, " shall

---

* Acts of a General Nature, of the State of Ohio, Columbus, 1837, p. 76.
† Swan & Critchfield's Revised Statutes, 224.      ‡ Id. 833.

*have a lien* thereon."* Ships and steamboats are made liable, &c., and " such liability shall be a *lien* thereon."† " The *lien* of the State," for taxes on real estate, &c.;‡ and so of many others.

III. As to the stock. Mr. Stanbery argues that when the stock was pledged all the property of the company was free, and then, if the company had been forced into liquidation, that the city would have stood in priority over stockholders, —it would then have had a priority not incident to common stock. This we must deny. The city we submit never had priority over other stockholders; it never had any other right than that common to all the stockholders, and if the company, after obtaining the $600,000 from the city, had been unable to build the road and had been dissolved and a distribution of the assets had taken place, the city would have had to suffer like other shareholders.

Finally, the distinction between the property of the corporation and the rights of the stockholders in the corporation sufficiently settled is disregarded by the last head of argument by the other side.

A corporation may be seized of acres of real property; deal largely in real estate; possess goods and money to any amount, but no individual stockholder has any direct interest in the *corpus* of the property itself. The property of the corporation belongs to it, and to it only. The interest of the stockholder is a share of the net produce of all the property of the corporation, brought into one fund. The stockholders are as distinct from the corporation as any other persons who are not stockholders. The money obtained·from the stockholders belongs to the corporation itself; the stock to the shareholders.§

Railroad shares are not an interest in lands. Whether they are goods within the statute of frauds or not, the cases do not agree. They resemble choses in action; have been

---

* Swan & Critchfield's Revised Statutes, 356.     † Id. 253.     ‡ Id. 1459
§ Bligh *v.* Brent, 2 Younge & Collier, 295; Bradley *v.* Haldsworth, 3 Meeson & Welsby, 422; State *v.* Franklin Bank, 10 Ohio, 91, 97; Johns *v.* Johns, 1 Ohio State, 351; Bridge Company *v.* Sawyer, 6 Exchequer, 507.

held to be choses in action.    They are in truth, merely, the evidence of a right to have a share of the profits of the business of the corporation.*

The city, then, by a mere pledge of these shares of the stock of this company, obtains no lien upon the railroad.

Mr. Justice NELSON delivered the opinion of the court.

There is no doubt but that every part of this transaction was within the competency of the City Council on the one side, and the railroad company on the other, as derived from the act of the legislature of Ohio, already referred to, of the 20th March, 1850, and was valid and binding upon both the parties.    The seventh section of this act confers the authority in express terms.    The City Council is authorized to contract with the railroad company, to secure, by mortgages, transfers, or hypothecations of their stock, or by such other liens or securities, real or personal, as may be mutually agreed upon, for the payment of the amount of the principal of the bonds as they become due, and for the reimbursement of any interest that might be paid by the city.

The question in the case is, what are the rights acquired by the city, on the one hand, and obligations assumed by the railroad company, on the other, by this arrangement?

If we look simply to the contract between the parties, it is impossible to entertain any doubt about them.    The city holds $1,000,000 in the stock of the company, as a security for the loan of $600,000 in city bonds, with a power of sale of the stock upon the terms mentioned.    The whole transaction consists in a loan of bonds and a pledge of stock.

It is argued, however, that this seventh section of the act of 1850 impresses upon the transaction an effect and operation over and beyond the mere rights and obligations arising out of the contract; that the section transmutes the pledge of stock into a lien or mortgage upon the road and fixtures of the company, and makes it not only a charge upon them but a charge prior in date to the second, and even the first mortgage; that, in effect, the pledge overrides all liens o

---

* Mechanics' Bank *v.* New York and New Haven R. R., 3 Kerman, 627

incumbrances upon the road and fixtures, whether prior or subsequent in time, and postpones them to this alleged statute security of the loan of the city bonds. Certainly a statute that can have such a peculiar and strikingly inequitable effect and operation, should be very explicit and positive, in order to obtain the assent of a court of law or equity.

The lien is supposed to be given by the latter clause of the section, which is, in substance, as follows:

" And for the further purpose of securing said city against all loss or losses which the same may suffer, whether by payment of the principal or interest, or any damages arising therefrom, that the above liens, mortgages, or other securities shall have priority or precedence of all claims or obligations subsequently contracted by such company, and over other liens, securities, or mortgages which were not duly entered into between said company and other persons, before the respective issues and loans."

It will be remembered that the first clause in the section gave to the City Council an option as to the security they might take for the advance of the bonds. They might take mortgages, or hypothecations of stock of the company, or such other lien or security, real or personal, as the parties should mutually agree to between themselves. The liens and securities, therefore, real or personal, that the City Council might require, depended upon their own views of what would be best for all the parties interested in the enterprise of building the road. They could have exacted a mortgage upon the road or fixtures, or both, or be satisfied with personal security, such as the hypothecation of stock. They did, at first, decide in favor of a mortgage on the road, but soon afterwards changed their opinion in favor of the hypothecation of stock—exacting a $1,000,000 of stock for the $600,000 in their bonds. Now, " the above-described liens, mortgages, and securities," referred to in the subsequent clause of the section, and to which priority and precedence are given over claims and obligations subsequently entered into, is to be taken distributively; that is, if the City Council should stipulate for a lien by way of mortgage, upon the road, or upon personal property belonging to the

company, or which might be acquired in the future, such liens or mortgages should have priority and precedence over claims and obligations subsequently contracted by the company.

The only answer to this view is, that it makes the clause a work of supererogation, as this would be the legal effect of the lien itself. That is true. The clause would be but declaratory of the law as it stood. This, however, is not a strange circumstance in legislation. A large portion of the modern codes is but declaratory of the common law as expounded by the courts. We prefer this interpretation to the one that gives a lien against the stipulations of the parties, and where both were free to enter into them as authorized by a previous clause of the same section. Under this liberty, given to the City Council and the company, the former rejected the lien upon the road by mortgage, preferring the personal security by a pledge or hypothecation of the stock.

The first clause of this section would be quite as idle and absurd a piece of legislation, which conferred upon the parties the authority of agreeing upon their own terms as to the nature and character of the security for the loans, as the latter, if, by the latter clause, whatever might be the security agreed upon, it must operate as a mortgage on the road, and have precedence over all others. Why give this choice of securities, if this would be the result? There was no necessity to stipulate for a mortgage on the road, if the statute gave the lien without it; nor propriety or sense in the choice between a mortgage and the pledge of stock, if a lien on the road followed either security.

The thirteenth section of the general law incorporating railroads, referred to as helping out this lien, we think, received its proper answer in the court below, as not applicable to this company; and the same in respect to a clause in the act of February 10, 1851, incorporating the Cincinnati Western Railroad Company.

We think the decree of the court below, against the claim of the city, was right, and should be

AFFIRMED.