THE STATE ex rel. HUDD vs. TIMME, Secretary of State.

*February 16 — February 21, 1882.*

CONSTITUTIONAL LAW.  *(1) Mode of amending the state constitution.  (2) When several propositions may constitute one amendment.  (3) Amendment of 1881 valid.  (4) When such amendment takes full effect.*

1. No amendment can be made to the constitution of this state [in the absence of a constitutional convention] without a compliance with the provisions of sec. 1, art. XII thereof, both in the passage of such amendment by the legislature and in the manner of submitting it to the people.

2. It is within the discretion of the legislature to submit several distinct propositions to the people as "one amendment," within the meaning of said sec. 1, art. XII, if such propositions relate to the same subject and are all designed to accomplish one purpose.

3. The several propositions submitted in 1881 all relate to a change from annual to biennial sessions of the legislature, and were intended to effect such a change; and they were properly submitted as a single amendment, and were adopted as such.

4. Said amendment cannot go into effect until an election of members of the assembly and of senators from the odd-numbered districts shall have

been held in November, 1882, and the legislature shall have fixed the time when sessions of the biennial legislature shall be held; and members of the legislature heretofore elected hold under the old provisions of the constitution, and the compensation to which they are entitled is that prescribed by those provisions.

MANDAMUS. This court having issued its alternative writ commanding the secretary of state to audit the relator's salary as a state senator at the sum of $500, or show cause, etc., the attorney general moved to quash the writ.

*The Attorney General,* for the motion:

I. The legislature is the body which, in all cases, must first pass upon the question whether it is one or more than one amendment, within the meaning of sec. 1, art. XII of the constitution, which is about to be submitted to the people. The uniform action of fourteen legislatures has been to treat every amendment to an article which treats of a particular subject, such as Legislative, Executive, Judiciary, Finance, Corporations, etc., as but one amendment, no matter how many different provisions or sections it may contain. See the amendment to art. IV, by adding sec. 31, which was submitted and adopted as one amendment, though changing the constitution in nine different respects or upon nine different subjects which have no connection with or relation to each other, except that they all pertain to the "Legislative" department; also the amendments to sec. 3, art. XI, secs. 5 and 9, art. V, sec. 2, art. VIII, sec. 4, art. VII, and the former amendment to sec. 21, art. IV. Such construction by the legislature has for fifteen years been approved and acquiesced in by the people and by all branches of the state government. This uniform construction and long acquiescence and practice ought to be conclusive. *Harrington v. Smith,* 28 Wis., 43, 68–9; *Scanlan v. Childs,* 33 id., 663, 666; *Prohibitory Amendment Cases,* 24 Kan., 700, 717–720. "The united understanding and action of the whole state in a matter of great public interest is a guide that any tribunal may safely follow." STOW,

320     SUPREME COURT OF WISCONSIN,

The State ex rel. Hudd vs. Timme, Secretary of State.

C. J., in *State ex rel. Bond v. French*, 2 Pin., 184. If it can be said that the intent of the framers of the constitution is even doubtful on the question whether every distinct proposition submitted is a distinct amendment and should be submitted as such, the broader construction is, that every such proposition is not an amendment within the meaning of that instrument; and, "where the intention of the framers of the constitution is doubtful, the people, assuming power under the broader construction, should have the benefit of the doubt." Jameson on Const. Convention, sec. 573. That the legislatures of 1880 and 1881 considered the several amendments under consideration one entire and inseparable proposition, is evident from the fact that both legislatures considered and voted on the whole together, and the legislature of 1881 submitted the whole together as a single scheme for the establishment of biennial sessions. It never occurred to those legislatures or to the people who ratified the amendments so submitted, that any other body of men should receive the $500 salary than the members who were to compose such biennial legislature. In construing a constitutional provision we are to be governed by the same rules of interpretation which prevail in relation to statutes. *State ex rel. Bond v. French*, 2 Pin., 184. The surrounding circumstances, the condition of things, the evils to be remedied and the objects to be attained, are all to be considered. *Clark v. City of Janesville*, 10 Wis., 135; *Harrington v. Smith*, 28 id., 69, 67–8. The cases construing the term "one subject," as used in sec. 18, art. IV of the constitution, may afford some light on the question what constitutes "more than one amendment" within the meaning of sec. 1, art. XII. *Mills v. Charleton*, 29 Wis., 400; *Phillips v. Town of Albany*, 28 id., 340, 356. II. The amendments under consideration, aiming at the single object of "biennial sessions," and being but a single proposition, must take effect together and not by piecemeal. The amendments to secs. 4 and 5 cannot by their terms take

effect until a year after their adoption. The amendment to sec. 11 evidently refers to a future provision by law for the time of meeting of the legislature. The term "regular session" in the amendment to sec. 21 refers to the meeting of the legislature "once in two years and not oftener," as provided in sec. 11; and sec. 21, as amended, provides a salary of $500 for such "regular session," instead of the $350 formerly given "*per annum.*" Until the election of members under secs. 4 and 5, there are no persons who can claim the salary fixed by sec. 21. It is evident that the legislature would not have submitted nor the people adopted the amendment increasing the salary, except as a part of the biennial system. See *Slauson v. City of Racine*, 13 Wis., 398, 404–6; *Warren v. Mayor, etc.*, 2 Gray, 84, 98–100.

*H. W. Chynoweth*, Assistant Attorney General, on the same side:

The term "amendment" in art. XII of the constitution means amendment to subject matter. The amendments in question all necessarily refer to one subject matter, i. e., biennial sessions of the legislature, and are to be construed as one amendment. All of the provisions contained in the different sections of such amendment are to be construed as applying only to its subject matter. *McHugh v. Timlin*, 20 Wis., 487; *Woodbury v. Shackleford*, 19 id., 55. And the whole amendment takes effect at the same time. *Real v. The People*, 42 N. Y., 270. The amendment does not take effect until after an election under it, and up to that time the constitution, as it was before the amendment was proposed, and the laws made under it, govern and control in all things. The provisions of the old constitution all remain in force until they are superseded by the practical operation of the provisions of the new, in conflict therewith. *Opinions of the Justices*, 3 Gray, 601; *S. C.*, cited and approved in *Day v. Bardwell*, 97 Mass., 246; *State v. Scott*, 9 Ark., 270; *State ex rel. Richardson v. Ewing*, 17 Mo., 515; *State ex rel. Dunning v. Giles*, 2 Pin., 166;

*State ex rel. Varney v. Wyman*, id., 360; *State ex rel. Wise v. Button*, 25 Wis., 109; *Chahoon's Case*, 20 Gratt., 733; *Supervisors of Doddridge v. Stout*, 9 W. Va., 703; *People ex rel. Davis v. Gardner*, 59 Barb., 198; *S. C.*, 45 N. Y., 812; *Real v. People*, 42 id., 270.

*Thomas R. Hudd*, the relator, in person:

Sec. 21, art. IV of the constitution, fixing the compensation of members of the legislature, was amended at the election in November, 1867. At the same election this relator was returned to one branch of the legislature, and drew pay under the section as amended, as did also sixteen senators who were elected in 1867, and seventeen senators who had been elected in 1866. No question was then made but that the amendment took effect at once as to all members of the legislature of 1868 then or previously elected. At the election in November, 1881, the same section was again amended, and the relator, as a member of the legislature of 1882, claims to be entitled to the salary which the constitution so amended prescribes. If, as argued, this amendment is but a part of the new proposed biennial system, and it was intended that the salary of $500 should be paid only for a biennial session, under what provision of law can the members of this legislature be paid? There can be no question that this is a "regular session" of the legislature. The right of members of this legislature to receive $350 died with the adoption of the amendment, which was prior to the commencement of their term of office. The amended section became a substitute for the former section, and worked its repeal. *State v. Campbell*, 44 Wis., 529; *Lewis v. Stout*, 22 id., 234; *Burlander v. M. & St. P. Railway Co.*, 26 id., 76; *Simmons v. Bradley*, 27 id., 689; *Moore v. S. & St. C. R. R. Co.*, 34 id., 173; *Oleson v. G. B. & L. P. Railway Co.*, 36 id., 383; *Matter of Executive Communication*, 15 Fla., 735.

Sec. 1, art. XII of the constitution, provides that all amendments submitted to vote of the people shall, if approved and

ratified, become a part of the constitution. There is nothing in sec. 21, art. IV, as amended, to indicate that it was not to take effect at once. And no legislation was needed for its full and complete operation. Nor did its operation depend, in any way, upon the adoption of the other amendments submitted to the people at the same time. Each of these amendments was a distinct and independent proposition, and any one of them might have been adopted or rejected without affecting the others. The language of the section in question is plain and unambiguous, and from it alone the intent is to be ascertained. 1 Story on Const., sec. 401; *Ogden v. Glidden,* 9 Wis., 46; *Blunt v. Walker,* 11 id., 334; *Woodbury v. Shackleford,* 19 id., 55; *Brightman v. Kirner,* 22 id., 54; id., 660; *Nichols v. Halliday,* 27 id., 406; id., 478; Cooley's Con. Lim., ch. 4; Potter's Dwarris on Stat., ch. 19; *Settle v. Van Evrea,* 49 N. Y., 280; *Hawkins v. Carroll Co.,* 50 Miss., 738. See 50 Ill., 86; *Beardstown v. Virginia,* 76 id., 34; *Hills v. Chicago,* 60 id., 86. It cannot be argued that the increase of salary was made only in view of the extra labor incident to a biennial session, and was therefore only payable for such a session. Considerable perquisites in the shape of stationery, stamps, etc., are cut off by the amendment, and the increase of pay may have been made in lieu thereof.

*Wm. F. Vilas,* as *amicus curiæ:*

1. Each and all of the provisions of sec. 1, art. XII of the constitution, prescribing the manner in which amendment of that instrument may be made without a convention of the people, are mandatory, not directory, and a failure to comply with any of the requirements thereof renders the attempt nugatory and void. *Collier v. Frierson,* 24 Ala., 100; *Opinion of the Judges,* 6 Cush., 573; *Durkee v. Janesville,* 26 Wis., 697; *State v. Swift,* 69 Ind., 518; Cooley's Con. Lim., 30. 2. The constitution is unmistakable in its mandate, "that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such

amendments separately." This provision needs no comment to show its value and importance. It is found in the constitutions of as many as twelve of the states of the Union. 3. That, instead of one, several amendments were proposed and submitted to the people by ch. 262, Laws of 1881, seems an unanswerable proposition, nothwithstanding the concurrence of the legislature and the attorneys-general in the contrary view. It is proposed, 1. To change the time of election and duration of the term of office of members of the assembly. 2. To do the like for senators. 3. To limit the legislative regular sessions to one every two years. 4. To alter the compensation of members. It is apparent on a moment's reflection that either one of these might be independently done. With the exception that the first and third seem naturally to go together, although not necessarily, there is no specially plausible connection between them. But especially the salary provision is independent. Suppose the proposed change had been to make the payment $1,000 or $2,000? And that has been once before amended independently. What shall we say of the supposed amendment of 1867, fixing the pay of members at $350 per annum and mileage? Was that not an amendment? If it was, is it not an amendment to now make it $500? Or was the first but a fourth of an amendment? Would it not be competent to provide for biennial sessions and still elect senators once in two years? But it is said, these amendments are all so connected in substance and as relating to one end, that they must be treated as one. Such a view destroys the constitution. Say that you propose an amendment to the powers of the legislature, and you can alter the whole of art. IV and sweep the bill of rights into one cauldron. Say but that you will amend the constitution in respect to the judiciary, and this court, the circuit courts and all inferior magistrates are confounded in an indiscriminate mass. This subject has received no judicial exposition of much value. So far as there is authority, or the look of it, it is with the view contended for:

Similar purposes were sought to be reached in Alabama. Eight sections received each slight alterations. The court declared them eight amendments. *Collier v. Frierson, supra.*

TAYLOR, J.   The relator asks this court to issue its writ of *mandamus* directing the secretary of state to audit his salary as a state senator at the sum of $500, and he bases his claim to that salary on the amendment of the constitution of the state adopted at the last general election, and commonly known as the biennial sessions amendment.   The relator claims that the old provision of the constitution fixing the salary of senators and members of the assembly at the sum of $350, was abro-gated by the adoption of the constitutional amendment referred to, at the moment it was adopted by the people, and that the amendment fixing the salary at $500 took effect from that date, and is the only provision of the constitution now in force fixing the salary of senators, and if they are not entitled to the sum of $500 they are not entitled to any salary.

On the part of the state, the learned attorney general insists that the amendment of the constitution fixing the salary of senators and members of the assembly was a part of the plan for changing from annual to biennial sessions of the legisla-ture, and that the salary mentioned in the amendment was clearly intended to be given only to such senators and mem-bers of the assembly as should be elected after the amendment took effect, and to those who should hold over under the second provision of the amendment, and who would become members of the legislature under the constitution as amended, and mem-bers of a legislature whose sessions were biennial instead of annual.

This amendment has been the subject of considerable criti-cism, because it did not provide more specifically when the new system should go into effect, and also for not declaring in express terms that the old system of things should remain in force until a legislature was elected and convened under the

new. It is certain that much discussion and considerable doubt would have been prevented if these matters had been more specifically provided for in the amendment.

It is our duty to examine and construe the amendment as it has been adopted by the legislature and the people, and give it effect, if we can, without interrupting the harmonious action of the government until such time as its provisions can be carried into effect by proper action under it. That it was not expected or intended that the provisions of the amendment should go into effect, practically, immediately upon its adoption by the people, seems to us very clear from a mere reading of its provisions. It *first* provides that members of the assembly shall be chosen biennially by single districts, on the Tuesday succeeding the first Monday of November after the adoption of this amendment; *secondly*, that the senators are to be chosen at the same time and in the same manner as the members of the assembly, except that they shall be chosen alternately in the odd and even numbered districts, and that all senators elected after the adoption of the amendment shall hold their offices for four years, and that the senators elected or holding over at the time of the adoption of the amendment shall continue in office till their successors are duly elected and qualified; *thirdly*, that the legislature shall meet at the seat of government, at such time *as shall be provided by law*, once in two years, and no oftener, etc.; and *fourthly*, that their compensation, by way of salary, shall be $500; and it cuts off certain perquisites which are now received by the members of the legislature.

In giving construction to these provisions we must look at the state of things existing at the time of their adoption, and they must be considered in connection with the proposed change. At the time of their adoption the constitution provided for annual sessions of the legislature, and for an election of members of the assembly, and of half the senators, on the same day that these amendments were submitted to and voted

upon by the people. It would be absurd to hold that there was any intention, on the part of either the legislature or the people, to interrupt the regular course of government of the state by the adoption of these amendments. It is very clear, we think, that it was contemplated that members and senators would be elected as usual on the day the vote was taken on the amendment, and that the legislature would meet on the day prescribed by the constitutional provision and the law then in force upon that subject. This is evident from the fact that the amendment provides that the senators *elected* or *holding over at the time* of the adoption of this amendment shall continue in office till their successors are duly elected and qualified. This provision clearly contemplated that the senators and members of assembly elected the same day the vote on the amendment was taken, should remain in office until their successors should be elected at the first election under the amendment. From this fact it is evident that the amendment clearly contemplates the existence of a constitutional legislature, after its adoption, which would be composed of the senators and members chosen at such election and not under the provisions of the amendment. This is further made clear from the third provision, which declares that " the legislature shall meet at the seat of government, at such time as shall be provided by law, once in two years and no oftener," etc.

These provisions contemplate that there would be a constitutional law-making body in the state after the adoption of the amendment, and before any legislature could be elected or convene under it. There can be, we think, no doubt but that the legislature in passing, and the people in ratifying, the amendment contemplated and intended that the old system of things should remain in full force until an election could take place under the new. Any other construction of the amendment would be in plain contradiction of its terms, and would render it impossible to put its provisions into practical effect. To hold that these amendments took effect immediately on

their adoption, so as to absolutely abolish the present provisions of the constitution for all purposes, would compel us to hold that the present legislature was not a constitutional body, and that all its proceedings were absolutely void. We think no such construction is required from the language used in the amendments; and it is very clear that such was not the intention either of the legislature or the people. Fortunately we are not without authority upon a question which involves such serious consequences; and we are indebted to the careful research of the learned attorney general and his assistant for presenting them upon the hearing. The question as to the time when a constitutional amendment shall go into effect, and what effect its adoption shall have upon the existing state of things, has received the careful consideration of the learned judges of the supreme court of Massachusetts, in an opinion found in 3 Gray, 601. Under the constitution of that state the judges were called upon by the governor to give their opinion upon several questions propounded to them, as to the effect which certain amendments of the constitution of that state had upon the tenure of office of certain officers in office at the time they were adopted. It appears that previous to the adoption of the amendments to the constitution of that state, in 1855, the executive councilors were not elected by the people; neither were the secretary, treasurer, auditor or attorney general, and certain county officers. The amendments provided that these officers should thereafter be elected by the electors of the state. The first questions submitted read as follows:

"What is the effect, if any, of the third article of the amendment of the constitution this year adopted, upon the tenure of office of the present executive council? Will the said article affect the manner of the election of the next executive council? Under which system must vacancies in the council be filled? If under the old, up to what time?"

The learned judges start out with the proposition that the

JANUARY TERM, 1882.                    329

The State ex rel. Hudd vs. Timme, Secretary of State.

amendments, "so far as they are inconsistent with the previous provisions of the constitution, vacate and annul them, but in all other respects the former provisions remain in force," and then proceed to say:

"In answer to the first question, we are of the opinion that the third article of these amendments will have no effect whatever upon the tenure of office of the present members of the executive council. Even if no legislative action were necessary, there could be no election of councilors until the Tuesday next after the first Monday of November, 1855, and the councilors then chosen cannot enter upon the duties of their offices until the first Wednesday of January, 1856; at which time, or as soon thereafter as others are chosen and qualified in their places, the offices of the present council will cease. The present amendment contains no express repeal of preexisting provisions of the constitution; it repeals them by necessary implication by providing another and different mode of filling these offices, *but it cannot have that effect until it comes practically in operation.*

"But there is another consideration, equally conclusive, to the same result. The present provisions of the amendment cannot be practically carried into effect, and there can be no election of councilors by the people, until the legislature shall have divided the commonwealth into eight districts. The terms are explicit: 'The legislature, at its first session after this amendment shall have been adopted, shall divide the commonwealth into eight districts.' This action of the legislature is therefore necessarily preliminary to any other step."

And the judges held that, although the amendment was adopted in 1855, the councilors of 1856 should be appointed under the old provisions of the constitution, because, by the terms of the amendment, none could be elected under the new until November, 1856; and when elected their terms of office would not commence until January, 1857. The same was held in relation to the effect of the amendment as to the election of

secretary, treasurer, auditor and attorney general; and the judges were clearly of the opinion that the persons holding these offices at the time the amendment was adopted would continue to hold them until their successors were elected under the provisions of the amendment fixing the time for such election; and in regard to the election of sheriffs and other officers the learned judges say:

"The terms of the amendment are, that the legislature shall prescribe, by general law, for the election of sheriffs, registers of probate, commissioners of insolvency, and clerks of the courts, by the people of the several counties, and district attorneys by the people of the several districts, for such term of office as the legislature shall prescribe. It is very manifest that under this amendment no act can be done until the legislature shall, by law regularly passed, in the ordinary course of its operation, provide for the election of these officers by directing the time, place and manner of voting," etc. "We are, therefore of the opinion that until such laws have been passed in the due course of legislative action, and until elections shall have been made pursuant to such laws, and the officers in question have been chosen, returned and commissioned in the mode thus provided, the persons holding these offices under the constitution and laws as they existed when this amendment was adopted and went into operation, will continue to hold their offices upon the same tenure, and on the same terms, as if this amendment had not been adopted."

The effect of the decision of the learned judges was, that the amendments did not repeal the old provisions, and the existing state of things, until the several amendments took practical effect under their own provisions.

A similar decision as to the effect of an amendment of the constitution of a state upon the state of things existing at the time the amendment was adopted, was made by the supreme court of Arkansas in the case of *State v. Scott*, 9 Ark., 270. In this case two of the learned judges delivered elaborate

opinions, holding that an amendment which declared that "the qualified voters of each judicial circuit shall elect the circuit judges," must be construed in harmony with other provisions of the constitution. The judges, at the time the amendment was adopted, were appointed for a fixed term by the legislature, and it was held that the judges in office when the amendment was adopted were entitled to hold out their respective terms notwithstanding the amendment. The same construction was given to an amendment of the constitution by the superior court of Missouri. *State v. Ewing*, 17 Mo., 515. See also the case of *People v Gardner*, 59 Barb., 198; affirmed, 45 N. Y., 812.

We think these opinions are quite applicable to the question we have to determine in this case, viz., When does the amendment as to the biennial sessions go into practical effect? Under the amendment it cannot go into effect until an election of members and senators in the odd-numbered districts takes place at the general election in November next, and until the legislature fixes the time when the sessions of the biennial legislature shall be held. Until the election takes place under the amendment in November next, and until the commencement of the term of office of the members so elected, the present state of affairs must continue, and the members heretofore elected are members of the legislature under the old provisions of the constitution, and their compensation must be that prescribed by the constitution before the amendment was adopted. It seems very clear to us that the provisions changing the compensation of the members of the legislature was a part of the general purpose to change from annual to biennial sessions, and was not intended to affect the rights of members elected and acting under the old order of things. The increased compensation was intended to cover the increased service which would be required of the members under the biennial system. The members of the legislature spoken of in the fourth provision clearly mean those members who should

be elected under, or who, holding over, should be called upon to serve as such under, the amended constitution, and not those elected and serving under the constitution as it existed at the time of the adoption of the amendment and before it went into practical effect.

What has been said disposes of the questions raised by the relator, and entitles the respondent to an order discharging the rule against him.

But another question affecting the validity of the amendment in question has been much discussed, both in the legislature and in the public press, and, as it seemed very desirable that all questions bearing upon the question of its regular adoption by the people, so as to become a part of the fundamental law of the state, should be passed upon on the hearing of the motion to discharge the order for a *mandamus* in favor of the relator, we have heard the arguments of counsel upon that question also. The question referred to is, Was the amendment properly submitted to the electors for their ratification? It is claimed by the learned attorney general that the amendment was a single amendment, within the meaning of section 1, art. XII of the constitution of this state, and that it was submitted to the electors as a single amendment, and voted upon by them as such. On the part of those who claim that the amendment was not properly submitted to the electors, and that consequently it was never properly ratified by them, it is insisted that the amendment is not a single amendment, but that it constitutes at least four amendments to the constitution, and that, in order to have the same properly ratified by the people, it should have been submitted as four propositions, each to be voted upon separately, and that, not having been so submitted or voted upon, it is not ratified as prescribed by the constitution, and so is not now a part thereof. This question was very fully and ably argued on the part of the state by the learned attorney general, in favor of the proposition that the amendment was a single amendment within the meaning of

the section of the constitution referred to, and was properly submitted and voted upon as a single amendment, and so was properly ratified by the voters as an amendment to the constitution. Upon the other side, Col. William F. Vilas, both in the character of *amicus curiæ* and also as representing those who doubt the regularity of the proceedings to adopt the amendment, submitted a clear, candid and forcible argument against its validity, because it was submitted and voted upon as a single amendment.

Section 1 of article XII of the constitution, which prescribes how amendments can be made to the constitution without calling a convention for that purpose, reads as follows: "Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon, and referred to the legislature to be chosen at the next general election, and shall be published for three months previous to the time of holding such election. And if, in the legislature so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe, and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become a part of the constitution: provided, that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately."

There is no question made against the regularity of the proceedings upon the proposed amendment so far as they relate to the manner in which they were agreed to or adopted by the

two consecutive legislatures, nor that the amendment was not properly published before the election of the second legislature which agreed to the same, nor to the manner of submitting the same to the people to vote thereon, in any other matter except that it was submitted as one amendment, to be voted on as such. The learned counsel for the state claim that the matter agreed to by the two legislatures and submitted to the people was but a single amendment to the constitution within the meaning of the section of the constitution above quoted. On the other side it is claimed that the matter contains at least four amendments, and that each should have been submitted and voted upon separately. We agree with the learned counsel who made the argument in opposition to the regularity of the submission, that there can be no dispute that the two legislatures which agreed to the proposition proceeded upon the theory that the several propositions amounted to but one amendment of the constitution. They were all included in one resolution adopted by the first legislature, and ratified and agreed to by the second as one, and they declare it to be but one amendment. The votes in the legislatures were all votes taken upon them as a single amendment, and not as several and distinct amendments. We also agree with the learned counsel that no amendment can be made to the constitution without complying with the provisions of section 1, article XII, above quoted, both in the passage of the amendment by the legislatures and in the manner of the submission.

It was said by counsel that there is no authority upon the question in dispute which rises to the dignity of authority. In the case cited from 24 Ala., 100, it is true, the court speaks of certain propositions to amend the constitution so as to change from annual to biennial sessions. In that case six different sections of the constitution were amended by striking out the word "annual" and inserting in its stead the word "biennial;" but in examining that case it will be seen that there were but two questions submitted to the electors to vote upon, and one

of them covered the amendments to the six sections relating to biennial sessions. No question was made in that case as to the regularity of the submission in that form. See p. 102. This fact can, however, have but little bearing upon the question under our constitution, as the constitution of Alabama upon the subject of amendments is radically different from ours upon the same subject. See 1 Poor's Const., 44. The constitution of 1819 of that state seems to have been in force in 1854, when the decision in question was made. We must determine, then, what is meant by the provision of said section 1, article XII, which says, that "if more than one amendment .be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately."

This provision can have but two constructions: First, it may be construed as is contended for by the learned counsel who contends that the amendment under controversy was not properly submitted, that every proposition in the shape of an amendment to the constitution, which standing alone changes or abolishes any of its present provisions, or adds any new provision thereto, shall be so drawn that it can be submitted separately, and must be so submitted. Such a construction would, we think, be so narrow as to render it practically impossible to amend the constitution; or, if not practically impossible, it would compel the submission of an amendment which, although having but one object in view, might consist of considerable detail, and each separate provision, though all promotive of the same object and necessary to the perfection and practical usefulness thereof if adopted as a whole, in such form that a defeat of one of its important matters of detail might destroy the usefulness of all the other provisions when adopted. Take the case as presented by the amendment under consideration. The learned counsel admits that the proposition to change from annual to biennial sessions is so intimately connected with the proposition to change the tenure of office of members of the assembly from one year to two years, that the propriety

of the two changes taking place, or that neither should take place, is so apparent that to provide otherwise would be absurd. And yet it is insisted that the two changes are two separate amendments within the meaning of the constitutional provision above quoted, and must be submitted separately. If they must be submitted separately, why must they? Certainly they should either both be defeated or both adopted. Why, then, should the people be permitted or compelled to vote upon each separately? Certainly no good could result from a separate submission which is not equally as well and better accomplished by submitting them together as one amendment; and the separate submission might result in the absurdity of the ratification of the one and the rejection of the other. This illustration is, to my mind, almost conclusive that no such intention was entertained either by the framers of the constitution or by the people who adopted it.

We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. Tested by this rule, the propositions submitted to the electors contained but one amendment. It is clear that the whole scope and purpose of the matter submitted to the electors for their ratification was the change from annual to biennial sessions of the legislature. It was so spoken of by the legislative bodies which passed it, as well as by the electors who ratified it. To make that change it was necessary, in order to prevent the election of members of assembly, half of whom would never have any duties to perform, that a change should be made in their tenure of office as well as in the times of their election, and the same may be said as to the change of the tenure of office of the senators. It is true that

it would not have been so absurd not to have changed their tenure of office as it would have been in the case of the members of the assembly; but it was just as important in order to preserve the difference in tenure prescribed in the original constitution. The policy of the original constitution was that a state senator should hold his office during two sessions of the legislature, so that that body might never be composed of entirely new members. There was no purpose to change the policy of the original constitution as to the stability of the organization of the senate, by changing to biennial sessions, and so it became highly proper, if not absolutely necessary, as a part of that change, to change the term of office of the senators as well as of the members. The question of compensation was, perhaps, less intimately and necessarily connected with the change to biennial sessions, yet it was clearly connected with it. The duties and service having been somewhat enlarged, it was proper that the compensation should be increased. We do not contend that the legislature, if it had seen fit, might not have adopted these changes as separate amendments, and have submitted them to the people as such; but we think, under the constitution, the legislature has a discretion, within the limits above suggested, of determining what shall be submitted as a single amendment, and they are not compelled to submit as separate amendments the separate propositions necessary to accomplish a single purpose. The learned attorney general has shown, beyond any controversy, that such has been the construction put upon this section authorizing amendments of the constitution, by the legislature, and by the executive and administrative officers of the state, and that such construction has been acquiesced in by the people, and has been approved, at least *sub silentio*, by this court.

The amendment ratified at the general election of 1871, prohibiting the legislature from passing special or private laws in certain cases, and requiring it to provide general laws for the transaction of any business prohibited by such amendment, is

certainly as open to the objection that it was not a single amendment but several, and that they should have been submitted separately, as the one now under consideration. Yet that was submitted as a single amendment and adopted as such, and this court, as well as the executive and legislative departments of the state, have never questioned its validity. Its provisions have been commented upon and upheld by this court in the following cases: *Attorney General v. Railroad Cos.*, 35 Wis., 425; *Kimball v. Town of Rosendale*, 42 Wis., 407, 415; *S. P. Boom Co. v. Reilly*, 44 Wis., 295–301. It may be said that in none of these cases was the question now raised argued or considered. We think, judging from the character of the counsel who argued at least one of those cases, and whose interest it was to have defeated the effect of the amendment, it was a pretty strong evidence that they at least were of the opinion that there was no objection to its validity. In our view of the case, that amendment was a single amendment, having for its purpose one thing, viz., the prevention of special legislation in nine different classes of cases; and, as a consequence of such restriction upon legislative action, providing that general laws should be enacted for the purpose of accomplishing the objects which could not be thereafter accomplished by special laws.

No one would contend but that it would have been entirely competent under the constitution for the legislature to have adopted separately and submitted separately each of the nine propositions in that amendment; but that fact has no force as an argument to prove that it could not be submitted as one amendment, if in the discretion of the legislature it saw fit to submit it in that way. The general purpose and object of the amendment was to restrict the power of the legislature in the matter of enacting special and private laws; and in that view of the case it was a single amendment, and could properly be submitted as such under the constitution, or as several amendments, as the legislature should determine. It was shown by

the argument of the learned attorney general that all or nearly all of the seven amendments which have been adopted and accepted as properly ratified by the people, upon a submission of the same as single amendments, are subject to the same objection that is taken to the one now under consideration; and if this was not properly submitted and adopted, then most of the others were not. But adopting the construction which we think should be given to the twelfth article of the constitution upon the subject of amendments, they were all properly submitted as single amendments, because each had but one general purpose in view. All the several provisions in each were connected with and intended to carry into effect such general purpose.

The direction in the constitution requiring separate amendments to be submitted separately has no efficacy in determining what constitutes an amendment as distinguished from what constitutes two or more amendments; and as the word "amendment" is clearly susceptible of a construction which would make it cover several propositions, all tending to effect and carry out one general object or purpose, and all connected with one subject, as well as of the construction that every proposition which effects a change in the constitution, or adds to or takes from it, is an amendment, the construction which has been uniformly adopted by all the departments of the government for a series of years is entitled to great weight in settling by judicial decision what construction should be placed upon it.

The weight which should be given to such a uniform construction of a statutory or constitutional provision has been several times considered by this court, as will be found in the cases cited by the learned attorney general.

In the case of *State v. French*, 2 Pin., 180, the question under consideration was, whether a judge of probate was a judge within the meaning of the provision of the constitution prohibiting the election of judges within twenty days of a general election. Chief Justice STOW, in delivering the opinion in

that case, after submitting a very able argument showing that they were not judges within the meaning of the word as used in the constitution, adds: "But did the matter admit of a doubt in the first instance, that doubt should be regarded as removed by the action which has been had under this act. While this court will never allow its judgments to be influenced by popular opinion, the united understanding and action of the whole state in a matter of great public interest is a guide that any tribunal may safely follow."

In *Harrington v. Smith*, 28 Wis., 43, Chief Justice DIXON says: "The statute was enacted, and has been continuously interpreted, understood and acted upon by the executive department of the government, the officers appointed by law to carry its provisions into effect, as requiring the issue of certificates upon sales, for a period of twenty-one years and during twelve successive administrations of the state. Long and uninterrupted practice under a statute, especially by the officers whose duty it was to execute it, is good evidence of its construction; and such practical construction will be adhered to even though, were it *res integra*, it might be difficult to maintain it." The following cases, cited by the learned chief justice as sustaining the rule laid down by him, are all in confirmation of the rule stated: *McKeen v. Delancy*, 5 Cranch, 22; *Edwards' Lessee v. Darby*, 12 Wheat., 210; *Rogers v. Goodwin*, 2 Mass., 475; *Packard v. Richardson*, 17 Mass., 144; *Opinion of Justices*, 3 Pick., 517; *U. S. v. Gilmore*, 8 Wall., 330; *Union Ins. Co. v. Hoge*, 21 How. (U. S.), 36, 66; *Havemeyer v. Iowa County*, 3 Wall., 291.

In *Edwards' Lessee v. Darby* the court says: "In the construction of a doubtful and ambiguous law, the contemporaneous construction of those who are called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect."

In *Packard v. Richardson* the court uses the following language: "A contemporaneous is generally the best construc-

The State ex rel. Hudd vs. Timme, Secretary of State.

tion of a statute. It gives the sense of a community of the terms used by the legislature. If there is an ambiguity in the language, the understanding and application of it when the statute first comes into operation, sanctioned by long acquiescence on the part of the legislature and judicial tribunals, is the strongest evidence that it has been rightly explained in practice. A construction under such circumstances becomes established law."

In the *Opinion of Justices* it is said: "Contemporaneous expositions of doubtful provisions in all instruments, and particularly in legislative enactments and constitutional charters, are held to be legitimate and useful sources of construction." "What has been done in the beginning and has continued to be done for a long series of years, without any question as to the rightful power or authority on which such acts have been grounded, may be presumed by succeeding public agents to have been rightly and properly done, in case no private right or public immunity is invaded."

Authorities upon this question might be multiplied to an almost unlimited extent; but those cited are sufficient to justify us in giving great weight to the practical construction given to the provision of the constitution now under consideration, by the legislative, executive and judicial departments of the state, frequently ratified and approved, without raising any voice of dissent, by the people during a period of over fifteen years, and would compel us to affirm such construction although we might have entertained some serious doubts as to the real meaning thereof. Fortunately, in this case, the court entertains no serious doubt but that the practical construction given to it is the true construction, and the one most likely to accomplish in an orderly manner the amendment of the constitution under the provisions of section 1, art. XII.

*By the Court.*— The motion to quash the alternative writ of *mandamus* is granted.