STATE EX REL. THOMSON, Attorney General, Petitioner, vs. ZIMMERMAN, Secretary of State, Respondent.*

*September 10—October 6, 1953.*

---

* Motion for rehearing denied, without costs, on December 1, 1953.

For the petitioner there were briefs by the *Attorney General,* and *Stewart G. Honeck,* deputy attorney general, and *Roy G. Tulane,* assistant attorney general, and oral argument by *Mr. Tulane.*

For the respondent there was a brief by *Walter J. Mattison,* special counsel, and *Harry G. Slater* of counsel, both of Milwaukee, and oral argument by *Mr. Slater.*

A brief was filed for the Wisconsin State Industrial Union Council by *Max Raskin* and *William F. Quick,* both of Milwaukee, as *amicus curiae.*

A brief was also filed by the Junior Association of the Milwaukee Bar as *amicus curiae.*

BROWN, J. " . . . there is a presumption that all acts of the legislature are constitutional until established otherwise, and this presumption applies to apportionment acts as well as other statutes." *State ex rel. Broughton v. Zimmerman* (1952), 261 Wis. 398, 411, 52 N. W. (2d) 903.

Our attention, then, must be directed first toward the attack on the Rogan Act, for unless that has merit the pre-

sumption alone will sustain the legislation. To understand the act and the objections which the defendant makes to its validity, certain facts set forth in the pleadings, or of which we may take judicial notice, must be recognized.

In 1951, by the Rosenberry Act, the legislature reapportioned the state to comply with the command of sec. 3, art. IV, Const., reading:

"At their first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants, excluding Indians not taxed, soldiers, and officers of the United States army and navy."

The Rosenberry Act survived attack in the courts (*State ex rel. Broughton v. Zimmerman, supra*) and, certain conditions precedent having come to pass, both parties concede that unless the Rogan Act has superseded it, the Rosenberry designation of legislative districts will govern the apportionment of both houses of the legislature to be elected in November, 1954. At the time this legislation was enacted there was much discussion of a proposal to base representation in the legislature on the size or area of legislative districts as well as on the population of a district, thus modifying the principle of sec. 3, art. IV, Const., which recognized human beings only in determining legislative representation. Responding to the agitation for area recognition, the 1951 legislature adopted Joint Resolution No. 59, looking toward an amendment of such sec. 3. This resolution came before the 1953 legislature as Joint Resolution No. 9 and was again adopted, with a further resolution to submit it to the vote of the people at the election to be held on the first Tuesday of April in 1953. The resolution with the submission provision follows, with the customary device of asterisks to indicate material struck out of the section to be amended and italics for that to be added:

"Whereas, at the regular session of the legislature in the year 1951, an amendment to the constitution was proposed and agreed to by a majority of the members elected to each of the two houses, which proposed amendment reads as follows:

" '(Article IV) Section 3. At their first session after each enumeration made by the authority of the United States, the legislature shall apportion and district anew the members of the senate and assembly, * * * *such apportioning and districting of members of the senate to be according to a district system based on area and population, and such apportioning and districting of members of the assembly to be according to population.*

" 'Section 4. The members of the assembly shall be chosen biennially, by single districts, on the Tuesday succeeding the first Monday of November after the adoption of this amendment, by the qualified electors of the several districts, such districts to be bounded by * * * town, *village,* or ward lines, *and* to consist of contiguous territory and be in as compact form as practicable.

" 'Section 5. The senators shall be elected by single districts of convenient contiguous territory, at the same time and in the same manner as members of the assembly are required to be chosen * * *. The senate districts shall be numbered in the regular series, and the senators shall be chosen alternately from the odd and even-numbered districts. The senators elected or holding over at the time of the adoption of this amendment shall continue in office till their successors are duly elected and qualified; and after the adoption of this amendment all senators shall be chosen for the term of four years.' Now, therefore, be it

"*Resolved by the assembly, the senate concurring,* That the foregoing amendment to the constitution is agreed to by this legislature; and be it further

"*Resolved,* That the foregoing proposed amendment be submitted to a vote of the people at the election to be held on the first Tuesday of April, 1953, and if a majority of the voters voting thereon approve this amendment, it shall become a part of the constitution of the state; and be it further

"*Resolved,* That the question of ratification of the foregoing amendment be stated on the ballot as follows:

" 'Shall sections 3, 4, and 5 of article IV of the constitution be amended so that the legislature shall apportion, along town, village, or ward lines, the senate districts on the basis of area and population and the assembly districts according to population?' "

The question appeared on the ballot in the form prescribed by the legislature and 433,043 votes were cast in favor of the amendment, so stated, and 406,133 votes against it.

After the result of the election was known the 1953 legislature proceeded under the authority of the amendment to redistrict the senate giving consideration to area as well as population. The Rogan Act, which became ch. 242, Laws of 1953, accomplished this by a formula in which area was figured at 30 per cent and population at 70 per cent in establishing the 33 districts each of which was entitled to a representative in the state senate. This act adopted the assembly-district provisions of the Rosenberry Act.

The defendant submits that the Rogan Act violates sec. 4, art. IV of the United States constitution by denying to Wisconsin a republican form of government. We are aware that in the composition of the senate of the United States and of the legislative bodies of many of the states, consideration is given to factors other than population, and such factors, which are principally geographical or municipal, result in departures from equality of representation for citizens living in different districts. Yet it has never been held that the republican form of government was lost thereby. We do not consider that such form has been destroyed by the Rogan Act.

Defendant also contends that area recognition, and particularly the recognition given by the Rogan Act, deprives citizens of the equal protection of the laws contrary to the Fourteenth amendment to the United States constitution. If the composition of the United States senate and the many state legislative bodies in which representation is based on

other factors than population, does not offend the Fourteenth amendment, on principle the Rogan Act does not. We consider that it lies with the people of the state to determine the basis upon which legislative districts are to be established and their will in this is final, providing that they make appropriate amendment of their constitution by the procedure prescribed by the constitution for adopting amendments.

While we hold that it is not beyond the power of the people to establish area as a factor in determining representation in the legislature, the legislature may not apportion the state in such a manner that practical equality of representation on the chosen basis is destroyed.

"It is proper to say that *perfect exactness* in the apportionment according to the number of inhabitants is neither required nor possible. But there should be as close an approximation to *exactness* as possible, and this is the utmost limit for the exercise of legislative discretion." *State ex rel. Attorney General v. Cunningham* (1892), 81 Wis. 440, 484, 51 N. W. 724.

Today, assuming that the proposed amendment was duly ratified, we should have to modify that quotation by saying: "According to the number of inhabitants *and the size of the district,*" but in the *Cunningham Case, supra,* the principle of approximate equality is correctly stated and has since been followed. See *State ex rel. Lamb v. Cunningham* (1892), 83 Wis. 90, 143, 53 N. W. 35, and *State ex rel. Bowman v. Dammann* (1932), 209 Wis. 21, 27, 243 N. W. 481. All these cases recognize that perfect, mathematical equality cannot be obtained for various reasons, but the court must presume, until such presumption is no longer possible, that the legislature intended and tried to comply with the constitution in enacting an apportionment act just as the court must presume good faith when other legislation is involved. Also,

"In viewing the fairness of the apportionment, the whole scheme of the statute must be taken into account, and not isolated instances where the legislature has fallen short of a perfect result." *State ex rel. Bowman v. Dammann, supra* (p. 31).

One very great impediment to perfect equality, or differently stated, one legitimate excuse for some inequality, in legislative districts has been the constitutional requirement that county, precinct, town, and ward lines be followed. By the proposed amendment these limitations on the formation of senate districts were removed, taking with them so much of justification for inequalities. Therefore, in apportionments made pursuant to such an amendment, as the Rogan Act was, a closer approximation to equality is to be expected and required than was formerly the case. Plaintiff concedes that in several instances it would have been physically possible to approach more nearly to exact equality by the modification of certain district boundaries but he submits that the variations do not exceed that tolerance to which legislation on so complex and difficult a problem is entitled. We do not follow this objection to the Rogan Act to a conclusion because it is the amendment itself and not the legislation under it which compels our decision and makes further study of such legislation unnecessary.

The apportionment of the state into senatorial districts hitherto has been made according to the number of inhabitants, excluding Indians not taxed, and soldiers and officers of the United States army and navy, pursuant to sec. 3, art. IV, Const. This section does not countenance any other basis and, accordingly, the constitutionality of the Rogan Act, which takes area into consideration, depends upon a successful, effective amendment of the constitution authorizing recognition of area in the formation of senatorial districts.

This recognition of area was one alteration,—but only one,—which Joint Resolution No. 9 proposed to make in

the existent constitution. In addition to directing that area was hereafter to be considered, sec. 3, art. IV, Const., was also to be amended by dropping the exclusion of Indians and the military in calculating population. In sec. 4 the former requirement that assembly districts should be bounded by county, precinct, town, or ward lines was changed to town, village, or ward lines. Since the constitution before the referendum forbade the division of an assembly district in the formation of a senate district (sec. 5, art. IV, Const.), senate-district lines necessarily followed assembly-district lines. The proposed amendment dropped the prohibition against dividing assembly districts in forming senate districts, and thus left no direction or restriction whatever as to the latter's boundaries. So long as the district is formed from territory which is "contiguous" and, in the discretion of the legislature, "convenient," constitutional requirements under this amendment would be met.

It is evident from the preceding paragraph that the amendment proposed by Joint Resolution No. 9 embraces many more changes in the constitution than the accommodation of an area factor in senate-district apportionment. It is evident, also, that the additional changes are not necessary to accomplish the result of giving consideration to area in apportioning the senate. In particular, the designation of assembly-district boundaries has nothing whatever to do with the senate. The assembly as well as the senate is further affected by the amendment of sec. 3, art. IV, Const., which removes the prohibition against counting certain Indians and the military in calculating the population base entitled to representation in each house of the legislature.

Sec. 1, art. XII, Const., directs that the legislature shall,

". . . submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe; . . . provided, that if more than one amendment be submitted, they shall be submitted in such

manner that the people may vote for or against such amendment separately.''

The question arises whether Joint Resolution No. 9 which was presented to the people as one amendment is in fact more than one and required separate submissions. In *State ex rel. Hudd v. Timme* (1882), 54 Wis. 318, 11 N. W. 785, the legislature and the people dealt with a proposal to have biennial instead of annual sessions of the legislature. In effecting this change there was submitted a single amendment which (1) provides for biennial sessions, (2) changed the time of election and term of office of senators, (3) changed the time of election and term of office of assemblymen, and (4) changed the salaries of legislators. The amendment was attacked as being in fact four amendments improperly submitted as one.

Mr. Justice Taylor for the court, said (p. 336):

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. . . ."

He concluded that the whole scope and purpose of the matter submitted to the electors for their ratification was the change from annual to biennial sessions and to make that change it was reasonably necessary that the terms of legislators be altered to correspond with the new state of affairs, and their compensation adjusted likewise, and he concluded further that in construing sec. 1, art. XII, Const., it is permissible to treat as one amendment a submission which covers several propositions all tending to effect and carry out one general object or purpose, and all connected with one subject.

Plaintiff repeatedly urges upon us that the change contemplated by the amendment was the direction to the legislature to take area as well as population into account in apportioning the senate districts and that the other changes which Joint Resolution No. 9 proposes in the constitution are details of that plan necessary, or at least convenient and proper, for the accomplishment of the main purpose. Thus, he reasons, there is no necessity of submitting more than a single amendment, under authority of *State ex rel. Hudd v. Timme, supra.*

At this point it is appropriate to observe that in specifying what shall be the boundaries of assembly districts the proposed amendment designates town, village, and ward lines in place of county, precinct, town, or ward lines. The *Cuningham Case, supra,* held that the constitution prohibited the creation of an assembly district which took in portions of more than one county unless it took in all of such counties. The great importance of that prohibition is discussed at length in the opinions filed by the several justices. The elimination of the county-line boundary of assembly districts is, then, a drastic, revolutionary alteration of the existing constitutional requirements on the subject.

As we have already pointed out, the proposed amendment permits the legislature to ignore assembly districts in the creation of senate districts. This great change, then, in the designation of the boundaries of assembly districts, has no bearing on the main purpose of the proposed amendment, as that is stated by the attorney general, nor does it tend to effect or carry out that purpose. It must have some different object or purpose and thus it fails to satisfy the test laid down in *State ex rel. Hudd v. Timme, supra,* entitling several changes to be submitted as a single amendment. We conclude, therefore, that a separate submission was required of the amendment changing the boundary lines of assembly districts.

A change of almost equal importance is that which revokes the provision of sec. 3, art. IV, Const., excluding untaxed Indians and the military from those who are to be counted in determining the representation to which a district is entitled, who, though they are not residents in the sense of being eligible to vote (in the case of the military see sec. 5, art. III, Const.), are, nevertheless, to be added by the proposed amendment when a district's representation in the legislature is calculated. We consider that a constitutional change in the individuals to be counted is not a detail of a main purpose to consider area in senate districts but is a separate matter which must be submitted as a separate amendment.

The submission of the proposed amendment at the April, 1953, election brings to our attention a strange omission. The commands of the constitution concerning the submission of proposed amendments to the people are those of sec. 1, art. XII, Const., referred to, *supra*. Pursuant to this authority to dictate the formalities of submission the legislature has enacted sec. 6.23 (8), Stats., which, so far as material here, states:

"Whenever a proposed amendment to the constitution, or any measure or other question shall be submitted to a vote of the people, a concise statement of the nature thereof shall be printed in accordance with the act or resolution directing its submission upon a separate ballot provided for that purpose, and underneath the question as thus stated shall appear the words 'Yes' and 'No,' . . ."

By sec. 6.10 (1), Stats., the legislature made further provisions but expressly limited them to the elections held in November of the years in which the state officers, legislators, and other officials are to be chosen. This subsection prescribes the notices which the secretary of state shall publish in advance of the election and then directs that if a constitutional amendment is to be submitted to the people

the amendment shall likewise be published and, appended to it, a brief statement of the change which the amendment will make in the constitution. He is directed to make this publication not later than the last Friday of September and once a week thereafter until the election takes place. There is no apparent reason why the legislature confined these general provisions of sec. 6.10 to those amendments which were to be voted on in November elections nor, if it did that, why it did not then prescribe similar formalities for the submission of this amendment in April, 1953, but so it is. As a matter of fact, the secretary of state in giving notice of the election and referendum in question published Joint Resolution No. 9 in the official state paper on February 21, 1953, and appended thereto what purported to be a brief explanation of the changes which the amendment, if approved, would make in the constitution. There is no contention that the publication was made once a week until election nor at any other time except on February 21st, but we cannot consider the publication to be of much importance one way or the other, for publication of election notices by the secretary of state is a purely ministerial act which has legal effect only as it complies with statutory or constitutional commands. The command of sec. 6.10 (1) to publish the amendment and explanation on the last Friday of September and once a week thereafter until election in November cannot by any rule of statutory construction breathe life into a publication made in February. We are compelled to hold that such publication by the secretary of state was not by or under direction of the legislature and was barren of any effect. It did not constitute part of the submission of the proposed amendment to the people and the only contemporaneous way in which the legislature prescribed the manner of submission of this amendment dealt with the time of submission and the form of the question to be stated on the ballot, as follows:

"*Resolved,* That the foregoing proposed amendment be submitted to a vote of the people at the election to be held on the first Tuesday of April, 1953, and if a majority of the voters voting thereon approve this amendment, it shall become a part of the constitution of the state; and be it further

"*Resolved,* That the question of ratification of the foregoing amendment be stated on the ballot as follows:

" 'Shall sections 3, 4, and 5 of article IV of the constitution be amended so that the legislature shall apportion, along town, village, or ward lines, the senate districts on the basis of area and population and the assembly districts according to population?' "

. By sec. 6.23 (8), Stats., the legislature has prescribed generally that the referendum ballot shall carry a concise statement of the nature of the proposed amendment and underneath the question as thus stated the words "Yes" and "No" shall appear. In *State ex rel. Ekern v. Zimmerman* (1925), 187 Wis. 180, 204 N. W. 803, we had occasion to consider the sufficiency of such "concise statement." We said then (p. 201):

"Had the legislature in the instant case prescribed the form of submission in a manner which would have failed to present the real question, or had they by error or mistake presented an entirely different question, no claim could be made that the proposed amendment would have been validly enacted. In other words, even if the form is prescribed by the legislature it must reasonably, intelligently, and fairly comprise or have reference to every essential of the amendment. This demonstrates quite clearly the fact that the form of submission is after all a mere form, and that the principal and essential criterion consists in the submission of a question or a form which has for its object and purpose an intelligent and comprehensive submission to the people, so that the latter may be fully informed on the subject upon which they are required to exercise a franchise."

Disregarding for the moment the controversy over whether this fairly comprised every essential of the amendment, we

repeat that the proposed amendment frees the legislature from the observance of any lines whatever in apportioning senate districts. The ballot question is expressed in mandatory language:—If the amendment is ratified the legislature *shall* apportion senate districts along town, etc., lines; yet the actual amendment, Joint Resolution No. 9, has no such mandate at all and under it the legislature is uncontrolled except that the territory inclosed shall be "contiguous" and "convenient." Some suggestion is made by plaintiff that the question on the ballot is sufficiently accurate because, though not compelled to do so, it would be expedient for the legislature, in districting, to follow the lines stated on the ballot. It does not lie in our mouths to say that that which the people think of sufficient importance to put in their constitution is in fact so unimportant that misinformation concerning it printed on the very ballot to be cast on the subject, may be disregarded. If the subject is important enough to be mentioned on the ballot it is so important that it must be mentioned in accord with the fact. The question as actually submitted did not present the real question but by error or mistake presented an entirely different one and, therefore, as stated by Mr. Justice DOERFLER in *State ex rel. Ekern v. Zimmerman, supra,* no claim can be made that the proposed amendment is validly enacted.

We conclude that there has been no valid submission to or ratification by the people of the proposed amendment and, therefore, the Rogan Act, ch. 242, Laws of 1953, which relies on the amendment for its own constitutionality, must be declared unconstitutional and void. Plaintiff's complaint must be dismissed and the declaratory judgment, which it seeks, denied.

We come then to defendant's counterclaim in which he demanded a judgment declaring that it is his duty to issue the call for elections to the legislature in accordance with the districting and apportionment provisions of ch. 728, Laws

of 1951 (the Rosenberry Act), until, at some time after the next federal census, some other valid apportionment of legislative districts shall be made.

It is quite clear that the invalid Rogan Act did not repeal or supersede the Rosenberry Act and the latter remains the law under which the secretary of state is required to issue the call for elections until replaced by some other valid apportionment. Whether that must wait until after the next census is a slightly different question.

Plaintiff properly concedes that under the constitution as it existed in 1951, no more than one valid apportionment may be made in the period between the federal enumerations. This concession agrees with what we have held in *Slauson v. Racine,* 13 Wis. *398, *401.

Plaintiff does not concede that a second apportionment may not be made between federal enumerations if, after the first apportionment, the constitution should be amended, as in the present proposed amendment, to embody a new scheme of representation in the legislature. The issue here is not moot because defendant's counterclaim, by asking us to declare that the Rosenberry Act shall control elections until after the next federal census, asks us to declare that there shall not be any more apportionments in the period between 1950, when the census was last taken, and the taking of the next census. This is asking too much. It lies within the power of the people to amend that portion of sec. 3, art. IV, Const., which sets the time at which apportionments may be made. Joint Resolution No. 9 did not do so but left that part unchanged.

"Where a constitution is revised or amended, (*a*) the new provisions come into operation at the same moment that those they take the place of cease to be of force; and if the new instrument re-enacts in the same words provisions which it supersedes, it is a reasonable presumption that the purpose was not to change the law in those particulars, but to continue

it in uninterrupted operation." Cooley, Const. Lim. (7th ed.), p. 96.

We conclude that the power to redistrict, which had been exercised and exhausted by the passage of the Rosenberry Act for the period after the 1950 United States census and until the next federal enumeration, would not be restored by an amendment such as this one which was silent on the date of the next apportionment but which left unchanged that portion of art. IV, Const., which did prescribe the date. But the fact that under the terms of Joint Resolution No. 9 a new apportionment could not be had, even if that resolution had been approved as a constitutional amendment, does not preclude the adoption of an amendment which, by proper provision for an earlier redistricting and apportionment, will modify the present effect of that part of art. IV. The prayer of defendant's counterclaim overlooks the possibility of thus amending the constitution before the next federal census and to that extent cannot be granted, although until such possible amendment or until a new apportionment is made following a new enumeration under the authority of the United States, the call for elections of legislators will be governed by the Rosenberry Act.

*By the Court.*—Complaint dismissed. Judgment granted on the counterclaim declaring that it is the duty of the secretary of state to issue the call for all elections of the members of the assembly and senate in 1954 in accordance with the provisions of ch. 728, Laws of 1951, and likewise in subsequent years prior to the enactment of a valid reapportionment after the census of 1960, unless in the meantime a valid constitutional amendment followed by appropriate legislation shall permit or direct otherwise.

On motion for rehearing, in addition to briefs filed by the attorneys for the petitioner and the respondent, respectively, a brief was filed by *Albert S. Vanden Heuvel,* city attorney of De Pere, and *Smith & Smith* of De Pere and *Kaftan, Kaftan & Kaftan* of Green Bay of counsel, as *amici curiae.*

The following opinion was filed December 1, 1953:

PER CURIAM (*on motion for rehearing*). By what plaintiff terms "a motion filed in the form of a motion for rehearing" he asks us to determine the application of ch. 550, Laws of 1953, to the plan of apportionment set up by ch. 728, Laws of 1951. Ch. 728 is the Rosenberry Act. Ch. 242, Laws of 1953, the Rogan Act, re-enacted the Rosenberry Act verbatim in so far as the latter established assembly districts, and then went on to designate senate districts in accordance with area as well as population. Ch. 550, Laws of 1953, made certain modifications in the assembly districts, as they were created by the Rosenberry Act and re-enacted by ch. 242, Laws of 1953.

The question before us in this action was the validity of apportioning senate districts giving consideration to area. In reference to the Rosenberry Act plaintiff's briefs told us: "We concede that ch. 728, Laws of 1951, was validly enacted and, absent any constitutional amendment, would have gone into effect on January 1, 1954. . . . we are of the opinion that the apportionment in that law under the existing constitution was as fair as it was possible to make it and that it would have been sustained by the court."

In support of the present motion plaintiff states that the Rosenberry Act established a few assembly districts, naming them, which are not created entirely of contiguous territory. In such cases ch. 550, Laws of 1953, is alleged to have

repaired this error by joining isolated areas to the districts to which they are actually contiguous. In the case of some other districts in whose creation no constitutional principle was violated, we are told that ch. 550, Laws of 1953, has made certain modifications in the boundaries designed to be improvements on those designated in the Rosenberry Act. The motion seeks to modify our mandate by recognizing these legislative actions and by giving appropriate directions to the secretary of state in respect thereto.

Our mandate dealt with the facts and questions of law presented to us, as they were stated in the report of the decision. It does not apply to nor govern a different set of facts such as plaintiff alleges now. We think it quite evident that a failure by the legislature to redistrict certain areas in conformity to constitutional requirements leaves the legislative power and duty to redistrict those areas unexercised, and hence unexhausted, and therefore subject to legislative action in establishing such district in accord with the constitution. But the assembly-district feature of the Rosenberry Act and the effect on it of ch. 550, Laws of 1953, was not within the issues argued before us nor can it be brought in as a rehearing of other issues which were. Treating plaintiff's motion as liberally as we can, this is new matter which we are unable to consider unless it comes before us in regular course. We are thus unable to modify the mandate previously announced, though in view of the present motion, we can append a caution that it deals only with the defects of the Rogan Act and the constitutional amendment upon which that was based, and does not touch the assembly-district provisions of ch. 728, Laws of 1951, nor their modification by ch. 550, Laws of 1953.

Motion denied without costs.