William C. McCONKEY,
Plaintiff-Appellant-Cross-Respondent,

v.

J. B. VAN HOLLEN,
in his role as Attorney General of Wisconsin,
Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 2008AP1868. Oral argument November 3, 2009.
—Decided June 30, 2010.*

2010 WI 57

(Also reported in 783 N.W.2d 855.)

1

4

For the plaintiff-appellant-cross-respondent there were briefs by *Lester A. Pines, Tamara B. Packard,* and *Cullen Weston Pines & Bach LLP,* Madison, and *Edward S. Marion* and *Edward S. Marion Attorney-At-Law LLC,* Madison, and oral argument by *Lester A. Pines.*

For the defendant-respondent-cross-appellant the cause was argued by *Lewis W. Beilin,* assistant attorney general, with whom on the briefs was *Raymond P. Taffora,* deputy attorney general, and *J.B. Van Hollen,* attorney general.

An amicus curiae brief was filed by *Brian W. Raum, James A. Campbell,* and *Alliance Defense Fund,* Scottsdale, Ariz., and *Samuel R. Taylor, Jr.* and *Samuel R. Taylor Jr. LLC,* Kenosha, on behalf of the Wisconsin Family Council.

An amicus curiae brief was filed by *William M. Conley, Callie M. Bell, Katherine C. Smith,* and *Foley & Lardner LLP,* Madison, and *Laurence J. Dupuis* and *ACLU of Wisconsin Foundation, Inc., Milwaukee,* on behalf of Lambda Legal Defense and Education Fund, Inc., Fair Wisconsin, and ACLU of Wisconsin.

An amicus curiae brief was filed by *Matthew W. O'Neill, Sara Elizabeth Dill,* and *Friebert, Finerty & St. John, S.C.,* Milwaukee, on behalf of League of Women Voters of Wisconsin Education Fund.

An amicus curiae brief was filed by *Michael D. Dean, Michael D. Dean, LLC,* and *First Freedoms Foundation, Inc.,* Waukesha, and *Richard M. Esenberg,* on behalf of Community Leaders Dedicated to Children Raised by Married Mothers and Fathers.

¶ 1. MICHAEL J. GABLEMAN, J. In November 2006, the people of Wisconsin approved the adoption of the following amendment to the Wisconsin Constitution:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.[1]

¶ 2. In July 2007, William McConkey, a voter and taxpayer, filed suit alleging, among other things, that this amendment (the "marriage amendment") was submitted to the people in violation of the constitution's requirement that voters must be allowed to vote separately on separate amendments (the "separate amendment rule"). In other words, McConkey claimed that the two sentences of the marriage amendment constituted two amendments, not one, and that because voters were not able to vote for or against each sentence, the marriage amendment was not validly adopted. The Attorney General countered that McConkey did not have standing to bring this claim because he suffered no

---

[1] Wis. Const. art. XIII, § 13.

actual injury, and maintained that the amendment was adopted in conformity with the separate amendment rule.

¶ 3.   The Dane County Circuit Court, Richard G. Niess, Judge, held that McConkey did have standing to bring suit because, assuming his claims are true, his rights as a voter were violated. Regarding the substance of his claim, the circuit court held that the two sentences of the amendment related to the same subject and furthered the same general purpose. Therefore, the two sentences constituted only one amendment. The court of appeals certified the case to this court, and we accepted review.

¶ 4.   The two issues before us are:

(1)   Does McConkey have standing to challenge the marriage amendment?

(2)   Was the marriage amendment adopted in violation of the Wisconsin Constitution's separate amendment rule?

¶ 5.   Though the precise nature of McConkey's alleged injury is difficult to define, we conclude that the policy considerations underlying our standing doctrine support addressing the merits of McConkey's claim, which we therefore choose to do.

¶ 6.   We hold that Article XIII, Section 13 of the Wisconsin Constitution—the marriage amendment— was adopted in conformity with the separate amendment rule in Article XII, Section 1 of the Wisconsin Constitution, which mandates that voters must be able to vote separately on separate amendments. Both sentences of the marriage amendment relate to marriage and tend to effect or carry out the same general purpose of preserving the legal status of marriage in Wisconsin as between only one man and one woman.

7

## I.  BACKGROUND

¶ 7.  During both the 2003 and 2005 sessions, the Wisconsin State Assembly and Senate adopted a joint resolution to amend the Wisconsin Constitution. Though the 2003 and 2005 versions contained minor procedural variations, the text of the resolution itself was identical. Both versions of the resolution contained what the parties have referred to as the title: "*To create* section 13 of article XIII of the constitution; **relating to:** providing that only a marriage between one man and one woman shall be valid or recognized as a marriage in this state." The substance of the resolution contained two sections. Section 1 stated the text of the proposed marriage amendment. Section 2 of the resolution addressed the numbering of the new proposed amendment.[2]

¶ 8.  Because the joint resolution was passed by two successive legislatures, the amendment was submitted to the people for ratification.[3] Wisconsin voters were asked the following question:

[2] The 2003 joint resolution also contained a further resolution that the "proposed amendment be referred to the legislature to be chosen at the next general election and that it be published for 3 months previous to the time of holding such election." The 2005 version contained additional resolutions related to the submission of the amendment to the people, including the question to appear on the ballot.

[3] Article XII, Section 1 of the Wisconsin Constitution, which contains the separate amendment rule, specifies one of the procedures for amending the constitution (the other is via a constitutional convention, *see* Wis. Const. art. XII, § 2). It provides in relevant part:

> Any amendment or amendments to this constitution may be proposed in either house of the legislature, and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment or amendments shall be . . . referred to the legislature to be chosen at the next general

Marriage. Shall section 13 of article XIII of the constitution be created to provide that only a marriage between one man and one woman shall be valid or recognized as a marriage in this state and that a legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state?

On November 7, 2006, Wisconsin voters approved this amendment by a vote of 59 percent to 41 percent.

¶ 9.  William McConkey is a registered voter and taxpayer who opposed both propositions contained in the marriage amendment and voted against it. He filed suit on July 27, 2007, challenging the marriage amendment on the grounds that it violated the due process and equal protection guarantees in the Wisconsin and United States Constitutions, and on the grounds that it was adopted in violation of the separate amendment rule in Article XII, Section 1 of the Wisconsin Constitution. The Attorney General countered that McConkey suffered no actual injury and therefore did not have standing to bring any of his claims. The Attorney General further argued that neither the substance of the amendment nor the process by which it was adopted violated the state or federal constitutions.

¶ 10.  On a motion to dismiss by the Attorney General, the Dane County Circuit Court, Richard G.

election . . . and if, in the legislature so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislature to submit such proposed amendment or amendments to the people in such manner and at such time as the legislature shall prescribe; and if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become part of the constitution; provided, that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately.

9

Niess, Judge, held that McConkey did not have standing to bring his due process and equal protection claims, but did have standing as a voter to challenge the process by which the amendment was adopted. If an amendment were invalidly submitted to voters, the circuit court reasoned, all voters were injured no matter how an individual would have voted had the different propositions been submitted separately. On the merits of McConkey's claim, the court held that the marriage amendment satisfied the requirements of the separate amendment rule, explaining that both propositions related to the subject matter of marriage and were designed to accomplish the same purpose: "the preservation and protection of the unique and historical status of traditional marriage."

¶ 11.   McConkey appealed, challenging the circuit court's holding on the merits of his separate amendment rule challenge.[4] The Attorney General cross-appealed, challenging the circuit court's grant of standing. The court of appeals certified both questions to this court, and this court accepted certification.

## II.  STANDARD OF REVIEW

¶ 12.   Whether a party has proper standing to bring suit is a question of law that we review de novo. *Krier v. Vilione*, 2009 WI 45, ¶ 14, 317 Wis. 2d 288, 766 N.W.2d 517. Whether an amendment to the Wisconsin Constitution was adopted in conformity with the proper procedures is also a question of law that we review de novo. *Milwaukee Alliance v. Elections Bd.*, 106 Wis. 2d 593, 604, 317 N.W.2d 420 (1982).

---

[4] McConkey's due process and equal protection arguments are not before us on appeal.

10

## III. DISCUSSION

¶ 13. Before we can address the merits of McConkey's challenge, we must first confirm whether McConkey's suit is properly before us—that is, whether McConkey has standing to bring his claim. Part A examines this question, concluding that the policies undergirding our standing doctrine support addressing the merits of McConkey's challenge. In Part B, we address whether the marriage amendment violates the constitution's separate amendment rule, concluding that it does not.

### A. Does McConkey Have Standing?

¶ 14. The Attorney General argues that McConkey does not have standing to challenge the marriage amendment. He asserts that because McConkey would have voted "no" on both propositions, which McConkey concedes is true, he suffered no actual injury to a legally protectable interest.[5] McConkey, on the other hand, frames this case as a violation of his basic voting and speech rights.

¶ 15. As a general matter, a litigant advancing a constitutional claim must have suffered an actual injury to a legally protected interest. *See State ex rel. First Nat'l Bank v. M & I Peoples Bank,* 95 Wis. 2d 303, 308, 290 N.W.2d 321 (1980). The law of standing in Wisconsin is construed liberally, and "even an injury to a trifling interest" may suffice. *Fox v. DHSS,* 112 Wis. 2d 514, 524,

---

[5] It is important to note that McConkey's standing argument comes to us under the procedural mechanism of a motion to dismiss, meaning that we take all facts alleged by McConkey to be true in determining whether he has standing to bring his claim. *See Repetti v. Sysco Corp.,* 2007 WI App 49, ¶ 2, 300 Wis. 2d 568, 730 N.W.2d 189.

11

334 N.W.2d 532 (1983). Unlike in federal courts, which can only hear "cases" or "controversies,"[6] standing in Wisconsin is not a matter of jurisdiction, but of sound judicial policy.[7] *Zehetner v. Chrysler Fin. Co.*, 2004 WI App 80, ¶ 12, 272 Wis. 2d 628, 679 N.W.2d 919.

¶ 16.   Standing requirements in Wisconsin are aimed at ensuring that the issues and arguments presented will be carefully developed and zealously argued, as well as informing the court of the consequences of its decision. *See Moedern v. McGinnis*, 70 Wis. 2d 1056, 1064, 236 N.W.2d 240 (1975) ("[T]he gist of the requirements relating to standing . . . is to assure that the party seeking relief has alleged such a personal stake in the outcome of the controversy as to give rise to that adverseness necessary to sharpen the presentation of issues for illumination of constitutional questions."); *In re Carl F.S.*, 2001 WI App 97, ¶ 5, 242 Wis. 2d 605, 626 N.W.2d 330 ("The purpose of the requirement of standing is to ensure that a concrete case informs the court of the consequences of its decision and that people who are directly concerned and are truly adverse will genuinely present opposing petitions to the court.").

¶ 17.   We sympathize with the argument that all voters are harmed by an amendment invalidly submitted to the people. Still, it is difficult to determine the

---

[6] The United States Constitution limits the jurisdiction of federal courts to only "cases" or "controversies." *See* U.S. Const. art. III, § 2, cl. 1.

[7] We do, however, look to federal case law as persuasive authority regarding standing questions. *Wisconsin's Envtl. Decade, Inc. v. Pub. Serv. Comm'n*, 69 Wis. 2d 1, 11, 230 N.W.2d 243 (1975).

precise nature of the injury here, and we are troubled by the broad general voter standing articulated by the circuit court. However, whether as a matter of judicial policy, or because McConkey has at least a trifling interest in his voting rights, we believe the unique circumstances of this case render the merits of McConkey's claim fit for adjudication.

¶ 18. Numerous reasons support our conclusion. First, McConkey has competently framed the issues and zealously argued his case. Second, it is likely that if his claim were dismissed on standing grounds, another person who could more clearly demonstrate standing would bring an identical suit, raising judicial efficiency concerns. Third, the consequences of our decision are sufficiently clear; a different plaintiff would not enhance our understanding of the issues in this case. Fourth, a detailed analysis of the nature of an injury here might inappropriately require us to prematurely interpret the substance of the amendment. Fifth, as a law development court, we think it prudent that the citizens of Wisconsin have this important issue of constitutional law resolved. The question of whether an amendment was effectually adopted weighs heavily in favor of addressing the merits of McConkey's challenge. Finally, none of our prior cases concerning the separate amendment rule involved a challenge on standing grounds. Instead, we addressed the issue without articulating a specific injury, and were animated by policy considerations similar to those articulated today. *See, e.g., State ex rel. Hudd v. Timme,* 54 Wis. 318, 332–33, 11 N.W. 785 (1882) (deciding to address the separate amendment claim because "forcible" arguments against the amendment's validity were presented and because of the importance of settling whether an amendment is part of the constitution or not).

13

¶ 19. Because we conclude that the merits of McConkey's claim are fit for consideration, we now move to the substance of his claim.

B. Was the Marriage Amendment Adopted in Violation of the Separate Amendment Rule?

¶ 20. Article XII of the Wisconsin Constitution defines the procedures for amending the constitution. Section 1 provides that a proposed amendment passed by each house in successive legislatures is to be submitted "to the people in such manner and at such time as the legislature shall prescribe." Wis. Const. art. XII, § 1. It further specifies that if a majority of the voters approve the amendment, it shall become part of the constitution "provided, that if more than one amendment be submitted, they shall be submitted in such manner that the people may vote for or against such amendments separately." *Id.* This is the separate amendment rule.

¶ 21. After passage by both houses in two successive legislatures and approval by voters in a referendum on November 7, 2006, Section 13 of Article XIII of the Wisconsin Constitution was created to read:

> Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state. A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state.

This is the marriage amendment.

¶ 22. McConkey argues that the marriage amendment was adopted in violation of the separate amendment rule. Specifically, McConkey argues that the marriage amendment is comprised of two amendments that

14

should have been presented to the voters separately, and that because it was not so presented, the marriage amendment was not properly adopted and is invalid, i.e., not currently part of the Wisconsin Constitution.

¶ 23.  To be clear, the question before us is not whether the marriage amendment is good public policy or bad public policy, nor is its interpretation or application before us today. The issue before us is whether the marriage amendment was adopted in conformity with the constitutional requirement that the people be allowed to vote separately on separate amendments. *See Milwaukee Alliance,* 106 Wis. 2d at 602 ("What is not before this court is the wisdom or constitutionality of the substance of the amendment. The issue, instead, is whether the legislature met the constitutional and statutory requirements for submitting the amendment to the electorate.").

¶ 24.  We begin our analysis in Part 1 by reviewing the text of the constitution's separate amendment rule and the three prior cases that have applied it. In Part 2, we define the test for determining whether an amendment violates the separate amendment rule. Finally, in Part 3, we apply the test to McConkey's challenge of the marriage amendment in this case.

### 1. The Constitution and Prior Case Law

¶ 25.  Article XII, Section 1 states that amendments may be submitted to the people "in such manner ... as the legislature shall prescribe." Thus, the constitution assigns considerable authority and discretion to the legislature in the way it submits amendments to the people for a vote. Our inquiry is "whether the legislature in the formation of the question acted reasonably and within their constitutional grant of authority and discretion." *Milwaukee Alliance,* 106 Wis. 2d at 604.

15

¶ 26. This is not to say the legislature's discretion is without limit. The constitution is clear that the people must be able to vote for or against each amendment "if more than one *amendment* be submitted." Wis. Const. art. XII, § 1 (emphasis added). On its face, this language does not prohibit a single constitutional amendment from being complex or multifaceted, or from containing a variety of specific prescriptions and proscriptions. The constitutional text suggests that the separate amendment rule is implicated only when the substance of an amendment cannot be said to constitute a single amendment.

¶ 27. Our case law affirms this understanding. This court has examined whether a constitutional amendment violates the separate amendment rule on three prior occasions. Each merits discussion.

¶ 28. This court first encountered a separate amendment rule challenge in *State ex rel. Hudd v. Timme,* 54 Wis. 318, 11 N.W. 785 (1882). In that case, the constitutional amendment contained four distinct propositions: (1) members of the Assembly would serve two-year terms instead of one-year terms, and be elected from single districts; (2) senators would serve four-year terms instead of two-year terms, and be elected alternately in odd and even numbered districts every two years; (3) the legislature would meet no more than once every two years; and (4) legislative salaries would increase to $500. *Id.* at 326.

¶ 29. We rejected as absurd the contention that each distinct proposition must be submitted separately. Such an approach would make amending the constitution unduly difficult, especially for complex issues or when an overall change might be impossible to effectuate if the voters could choose to adopt certain parts of the proposed amendment and not others. *Id.* at 335–36.

16

¶ 30.  Instead, we construed the separate amendment rule to require separate votes on "amendments which have different objects and purposes in view." *Id.* at 336. As such, we stated the following test: "In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other." *Id.*

¶ 31.  Applying this test to the facts of the case then before us, we concluded that all of the propositions related to the purpose of changing from annual to biennial sessions of the legislature. *Id.* Most interesting and relevant to McConkey's claim was our discussion of the legislative pay raise. This proposition was "less intimately and necessarily connected with the change to biennial sessions, yet it was clearly connected with it." *Id.* at 337. We explained that it was "proper" to increase the pay of legislators because of the increased duties and service required by the amendment. *Id.* Though the legislature certainly could have submitted the propositions as separate amendments, it did not need to do so because the constitution grants the legislature discretion in this area. *Id.* As long as there is one general purpose, and the items are connected with that purpose, the legislature has great latitude as to how it drafts amendments. *Id.*

¶ 32.  Our opinion went further and discussed other amendments that had been adopted. Article IV, Section 31 (since amended twice), for example, prohibited the legislature from passing special or private laws in nine different circumstances, and required the legislature to enact general laws for anything not prohibited by the amendment. *Id.* at 337–38. We noted that this amendment was far more open to challenge than the change from an annual to biennial legislature, but no

one thought to challenge its validity. *Id.* Even so, we stated that the amendment constituted a single amendment. *Id.* at 338. The general purpose of the amendment was to "restrict the power of the legislature in the matter of enacting special and private laws." *Id.* Again we stated that while each of the specifically prohibited types of private or special laws could have been submitted separately, the legislature had the discretion to submit them together. *Id.* In fact, all of the seven amendments that had been adopted up to that point were subject to similar objections, we explained, but all were acceptable because they had "one general purpose in view." *Id.* at 339. All of the propositions in each "were connected with and intended to carry into effect" the one general purpose. *Id.*

¶ 33.   We addressed the separate amendment rule again (among other issues) in *State ex rel. Thomson v. Zimmerman,* 264 Wis. 644, 60 N.W.2d 416 (1953). In that case, a constitutional amendment approved by the people made the following changes: (1) State Senate districts were to be created taking land area and population into account, not just population; (2) military personnel and "Indians not taxed," who were previously not counted in creating Senate and Assembly districts, were now to be counted; (3) Assembly districts were to be created using town, village, and ward lines, where previously they were to include county, precinct, town, and ward lines; and (4) Assembly districts no longer needed to fall entirely within a single Senate district. *Id.* at 653–54. The referendum question submitted to voters asked:   "Shall sections 3, 4 and 5 of article IV of the constitution be amended so that the legislature shall apportion, along town, village or ward lines, the senate districts on the basis of area and population and the assembly districts according to population?" *Id.* at 651.

18

¶ 34. The Attorney General argued that the amendment followed the requirements announced in *Hudd* because all of the provisions were "necessary, or at least convenient and proper, for the accomplishment of the main purpose" of taking area as well as population into account in apportioning Senate districts. *Id.* at 656. The *Thomson* court accepted without discussion[8] that the main purpose was to take area as well as population into account in apportioning Senate districts, but concluded that two of the propositions did not support this general purpose. *Id.* The changes to the Assembly districts eliminated the previous requirement that Assembly districts were to contain whole counties, a "drastic, revolutionary alteration" to the current constitutional scheme. *Id.* Relying on *Hudd,* we held that this change had "no bearing on the main purpose of the proposed amendment, . . . nor does it tend to effect or carry out that purpose." *Id.* Similarly, we held that the counting of untaxed Indians and military personnel was also "not a detail of a main purpose to consider area in senate districts." *Id.* at 657. Therefore, we concluded that the amendment was adopted in violation of the separate amendment rule. *Id.* at 660.[9]

¶ 35. The most recent case challenging an amendment under the separate amendment rule is *Milwaukee Alliance v. Elections Bd.,* 106 Wis. 2d 593, 317 N.W.2d

---

[8] The beginning of the *Thomson* opinion does discuss the legislative "agitation" for including land area as well as population in the formation of legislative districts. *State ex rel. Thomson v. Zimmerman,* 264 Wis. 644, 649, 60 N.W.2d 416 (1953). It is unclear how important this was in the court's determination of the general purpose of the amendment.

[9] We also struck down the amendment on the grounds that the referendum question was invalid and "did not present the real question." *See Thomson,* 264 Wis. at 657–61.

420 (1982). In that case, the amendment contained a series of changes to Article I, Section 8 permitting courts to deny or revoke bail for certain accused persons, and allowing courts to set conditions for release—bail among them—for the purposes of assuring the accused person's appearance in court, protecting the community, or preventing intimidation of witnesses. *Id.* at 602. The changes included both general statements of a court's power, as well as specific conditions tied to certain crimes. *Id.* at 601.

¶ 36. In that case, the issue was "whether the legislature in the formation of the question acted reasonably and within their constitutional grant of authority and discretion." *Id.* at 604. Citing *Hudd,* we asserted, "It is within the discretion of the legislature to submit several distinct propositions as one amendment if they relate to the same subject matter and are designed to accomplish one general purpose." *Id.* at 604–05.

¶ 37. We explained that the purpose of the amendment was "to change the constitutional provision from the limited concept of bail to the concept of 'conditional release.' "[10] *Id.* at 607. We concluded that the anti-monetary bail and conditional release provisions did not need to be submitted separately because defeat of one of the propositions would have destroyed the overall purpose of the amendment.[11] *Id.* The *Hudd* standard

---

[10] The joint resolution stated that the amendment related to "revising the right to bail and authorizing the legislature to permit circuit courts to deny release on bail for a limited period to certain accused persons." *Milwaukee Alliance v. Elections Bd.,* 106 Wis. 2d 593, 600, 317 N.W.2d 420 (1982). This "relating to" clause was certainly very similar to our articulation of the purpose. Nevertheless, we did not adopt or appear to consider it in our formulation of the purpose.

[11] We explained as follows:

was again key—the legislature may submit multiple propositions within one proposed amendment so long as those propositions tend to effect and carry out one general purpose and are connected with one subject. *Id.*

## 2. Defining the Test

¶ 38.   This is the fourth case challenging the validity of an amendment under the separate amendment rule. The dispute between the parties can be broken down into three issues. First, the parties disagree about the proper way to test the validity of an amendment under the separate amendment rule. Second, while both parties agree that the general purpose of the amendment is an important element of the test, they diverge over the method the court should use to determine the purpose. And third, the parties disagree over how the amendment in this case fares under the applicable test.[12]

¶ 39.   First, the parties offer dramatically different versions of the operative test arising from these cases. McConkey focuses on the anti-logrolling purpose[13] of the separate amendment rule and contends that, in order to

---

The Alliance argues that the issues of conditional release and anti-monetary bail should have been submitted to the voters as separate questions, because the successful adoption of either one would not have destroyed the usefulness of the other. That is not realistic. When the purpose of the proposed amendment was to change the historical concept of bail with its exclusive purpose of assuring one's presence in court, as defined by common law, to a comprehensive plan for conditional release, the defeat of either proposition would have destroyed the overall purpose of the total amendment.

*Milwaukee Alliance*, 106 Wis. 2d at 607.

[12] This third issue is discussed in Part 3.

[13] "Logrolling" is the joining of "unrelated provisions and creating a union of interests to secure passage" of legislation, or

survive review, the various propositions in an amendment must be aimed at a single purpose and be interrelated and interdependent such that if the propositions had been submitted as separate questions, the defeat of one proposition would destroy the overall purpose of the multi-proposition proposal. The Attorney General, quoting *Milwaukee Alliance,* counters that "[i]t is within the discretion of the legislature to submit several distinct propositions as one amendment if they relate to the same subject matter and are designed to accomplish one general purpose." 106 Wis. 2d at 604–05. He rejects the claim that propositions must be mutually dependent in order to be submitted as a single amendment.

¶ 40.  We agree with the Attorney General. We reaffirm this court's repeated holdings that the constitution grants the legislature considerable discretion in the manner in which amendments are drafted and submitted to the people. The inquiry is "whether the legislature in the formation of the question acted reasonably and within their constitutional grant of authority and discretion." *Milwaukee Alliance,* 106 Wis. 2d at 604. An otherwise valid amendment will therefore be construed as more than one amendment only in exceedingly rare circumstances.

¶ 41.  The proper test is laid out in *Milwaukee Alliance:* "It is within the discretion of the legislature to submit several distinct propositions as one amendment if they relate to the same subject matter and are designed to accomplish one general purpose." *Id.* at 604–05. As we

here, a proposed constitutional amendment. *State ex rel. Wisconsin Senate v. Thompson,* 144 Wis. 2d 429, 445, 424 N.W.2d 385 (1988).

22

stated in *Thomson,* all of the propositions must "tend to effect or carry out" the purpose. *Thomson,* 264 Wis. at 656.

¶ 42.   McConkey's position is inconsistent with the constitution's grant of discretion to the legislature, and is irreconcilable with these prior holdings. The distinct propositions need not be, as McConkey urges, interconnected and dependent upon one another such that if one proposition failed, the total purpose would be destroyed. While *Hudd* uses the phrase "dependent upon," the *Hudd* court did not use it to suggest an interdependency requirement as McConkey asserts. Instead, *Hudd* established the principle that the propositions must relate to the same subject and be "dependent upon *or connected with*" the same general purpose. *Hudd,* 54 Wis. at 336 (emphasis added). In *Hudd,* we explicitly rejected the notion that the propositions had to be interdependent; we required only a "connection" between the provisions. Hence, the legislative pay raise did not doom the amendment in *Hudd* because, though it was "less intimately and necessarily connected with the change to biennial sessions," it was nonetheless "clearly connected with it" and "proper." *Id.* at 337. McConkey's approach undoubtedly would have required striking down the legislative pay raise in *Hudd,* and likely would have also doomed the amendment challenged in *Milwaukee Alliance* because of some of its specific provisions.[14] The proposi-

───────

[14] One provision in the amendment at issue in *Milwaukee Alliance,* for example, stated, "In determining the 10–day and 60–day periods [specified in the amendment], the court shall omit any period of time found by the court to result from a delay caused by the defendant or a continuance granted which was initiated by the defendant." Wis. Const. art. I, § 8(3). The defeat of this proposition would surely not have defeated the overall

tions, then, need only relate to the same subject and tend to effect or carry out one general purpose.[15]

¶ 43.    This, of course, raises the second issue on which the parties spend considerable time—how should the general purpose of an amendment be determined? McConkey proposes that the best method for determining the purpose is to look to the "relating to" clause in the title of the joint resolution. In this case, the joint resolution states the amendment relates to "providing that only a marriage between one man and one woman shall be valid or recognized as a marriage in this state." Going further, McConkey argues that this is the *only* source the court can use to determine purpose. This approach, he asserts, is consistent with the approach used in Article IV, Section 18 of the Wisconsin Constitution[16] relating to private bills, and utilizes the rules of statutory construction by focusing on a plain reading of

purpose of the amendment of changing "from the limited concept of bail to the concept of 'conditional release.' " *Milwaukee Alliance*, 106 Wis. 2d at 607. However, it was connected with and tended to effect or carry out that purpose, and its inclusion therefore did not violate the separate amendment rule.

[15] Our prior cases have described, and we affirm here today, a test inquiring into both the subject matter and purpose of an amendment, suggesting a two-part test. *See Milwaukee Alliance*, 106 Wis. 2d at 604–05. In practice, however, the analysis in our prior cases has blended these two, often neglecting to discuss or analyze the subject matter of an amendment. *See, e.g., Hudd,* 54 Wis. at 337–39 (generally neglecting the discussion of the "subject" component of the test in its analysis). This is probably why the parties focus their arguments on how the purpose of an amendment should be determined; they do not debate how the subject of an amendment should be determined.

[16] Article IV, Section 18 provides: "No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

the joint resolution's title. The Attorney General counters that an amendment's purpose should be determined from its text and the context in which it was adopted following the constitutional interpretive approach outlined in *Dairyland Greyhound Park v. Doyle.*[17]

¶ 44. The general purpose of a constitutional amendment is not an interpretive riddle. Text and historical context should make the purpose of most amendments apparent. A plain reading of the text of the amendment will usually reveal a general, unified purpose. A court might also find other extrinsic contextual sources helpful in determining what the amendment sought to change or affirm, including the previous constitutional structure, legislative and public debates over the amendment's adoption, the title of the joint resolution, the common name for the amendment, the question submitted to the people for a vote, legislative enactments following adoption of the amendment, and other such sources.

¶ 45. This appears to have been the general approach followed in *Hudd.* In that case, this court identified the four propositions contained in the amendment from its text, and the general move from an annual to biennial legislature was apparent. The amendment was also known to the public as the "biennial sessions amendment." *Hudd,* 54 Wis. at 325.

¶ 46. In *Milwaukee Alliance,* the court described the purpose of the amendment with particularity:

---

[17] *Dairyland* states that the constitution should be construed by reference to the plain meaning of the provision, the debates and practices at the time, and the earliest legislative action following adoption. *Dairyland Greyhound Park v. Doyle,* 2006 WI 107, ¶ 19, 295 Wis. 2d 1, 719 N.W.2d 408.

The purpose of the amendment was to continue the guarantee of bail to those entitled to it, to allow release of some persons without requiring money bail but with other reasonable conditions, and at the same time, under a structured system, to hold persons for limited periods without the option of bail when a court determines that such action is necessary to protect the community from serious bodily harm or to protect society's interest in the administration of justice by preventing the intimidation of witnesses.

*Milwaukee Alliance*, 106 Wis. 2d at 608. This purpose appears to be gleaned from the text of the amendment. The court also described a general purpose of changing "from the limited concept of bail to the concept of 'conditional release.' " *Id.* at 607. The court appeared to decipher this purpose by comparing the previous constitutional structure with the provisions in the new amendment.[18]

¶ 47. The method for determining the purpose advocated by McConkey—adopting verbatim the "relating to" clause in the title of the joint resolution—is supported neither by case law nor by common sense. None of our cases follow McConkey's approach. Neither *Hudd* nor *Thomson* even discuss the title of the joint resolution. In *Milwaukee Alliance,* we noted the statement of purpose contained in the title of the joint resolution, but did not adopt it as McConkey suggests we must do here.

[18] The *Thomson* case, on the other hand, is a bit of an anomaly with regard to the determination of purpose. The court appeared to accept the statement of purpose proffered by the Attorney General, the officer charged with defending the amendment. See *Thomson,* 264 Wis. at 656. The court did not attempt to craft a purpose of its own, and seemed to suggest that the parties agreed on the purpose of the amendment.

¶ 48. McConkey's analogies to the restrictions on private bills in Article IV, Section 18 are also inapposite. The text of that provision itself states that private or local bills may encompass only one subject, "and that shall be expressed in the title." Wis. Const. art. IV, § 18. The separate amendment rule, however, contains no similar stricture, strongly suggesting the joint resolution's title should not be the conclusive, much less exclusive, statement of purpose. *See Weber v. Town of Saukville*, 209 Wis. 2d 214, 231, 562 N.W.2d 412 (1997) (stating the rule of construction that when the terminology of similar provisions is different, an inference is drawn that different meanings are intended).

¶ 49. Finally, while the statement of purpose in the title is relevant and helpful, limiting review to the title alone makes little practical sense. McConkey argues that limiting review to the text of the title is akin to statutory construction. It is not. McConkey's approach does not even allow the court to read the text of the amendment itself, much less the text of the entire joint resolution! Far from being comparable to statutory construction, McConkey's approach requires the court to put on blinders with regard to the amendment's content.

¶ 50. In summary, "It is within the discretion of the legislature to submit several distinct propositions as one amendment if they relate to the same subject matter and are designed to accomplish one general purpose." *Milwaukee Alliance*, 106 Wis. 2d at 604–05. The general purpose of an amendment may be deduced from the text of the amendment itself and from the historical context in which the amendment was adopted. And all of the propositions must "tend to effect or carry out" that purpose. *Thomson*, 264 Wis. at 656.

### 3. Applying the Test

¶ 51. The marriage amendment contains two propositions: (1) "Only a marriage between one man and one woman shall be valid or recognized as a marriage in this state"; and (2) "A legal status identical or substantially similar to that of marriage for unmarried individuals shall not be valid or recognized in this state." The text of this amendment and historical context in which it was adopted make its general subject and purpose plain.

¶ 52. A plain reading of the text of the amendment, in which both propositions expressly refer to "marriage," makes clear that the general subject of the amendment is marriage. McConkey does not seem to dispute this point.

¶ 53. Before the marriage amendment was adopted, marriage in Wisconsin was already limited by statute to the unions of one man and one woman. *See* Wis. Stat. § 765.001(2) (2005–06)[19] ("Under the laws of this state, marriage is a legal relationship between 2 equal persons, a husband and wife."); § 765.01 ("Marriage, so far as its validity at law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting is essential, and which creates the legal status of husband and wife.").[20] This amendment

---

[19] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

[20] Wisconsin Stat. § 765.001(2) states the public policy objectives and intent of the legislature in its regulation of marriage. It provides in relevant part:

It is the intent of chs. 765 to 768 to promote the stability and best interests of marriage and the family. It is the intent of the legislature to recognize the valuable contributions of both spouses during the marriage and at termination of the marriage by dissolution or death. Marriage is the institution that is the foundation of the family and of society. Its stability is basic to morality and civilization, and of vital interest to society and the

was therefore an effort to preserve and constitutionalize the status quo, not to alter the existing character or legal status of marriage.

¶ 54.   The first sentence preserves the one man-one woman character of marriage by so limiting marriages entered into or recognized in Wisconsin. The second sentence, by its plain terms, ensures that no legislature, court, or any other government entity can get around the first sentence by creating or recognizing "a legal status identical or substantially similar to that of marriage."[21] We need not decide what legal statuses identical or substantially similar to marriage are prohibited by this clause in order to understand its plain and general purpose.

¶ 55.   Why preserve the status quo through a constitutional amendment? This is no secret either. The sponsors of the amendment were quite clear that state supreme court decisions overturning the marriage laws of other states were the primary reason for the amendment.[22] In short, the sponsors of the amendment

state. The consequences of the marriage contract are more significant to society than those of other contracts, and the public interest must be taken into account always. . . . The impairment or dissolution of the marriage relation generally results in injury to the public wholly apart from the effect upon the parties immediately concerned. Under the laws of this state, marriage is a legal relationship between 2 equal persons, a husband and wife, who owe to each other mutual responsibility and support.

[21] McConkey argues that the second sentence has nothing to do with the first, an assertion that strains credulity. While the second sentence attempts to accomplish something different than the first sentence, it is plainly related to and connected with the overall purpose of the amendment.

[22] In the appendix to its brief, the Attorney General provided a copy of a memo dated January 29, 2004, from the sponsors of the amendment to fellow state legislators soliciting

wanted to protect the current definition and legal status of marriage, and to ensure that the requirements in the first sentence could not be rendered illusory by later legislative or court action recognizing or creating identical or substantially similar legal statuses. The purpose of the marriage amendment, then, was to preserve the legal status of marriage in Wisconsin as between only one man and one woman. Both propositions in the amendment tend to effect or carry out this general purpose.[23]

co-sponsorship of the proposed amendment. A copy is also available online at http://graphics2.jsonline.com/graphics/multimedia/media/oct06/legis3.pdf. (last visited June 25, 2010). The sponsors explained their proposal as follows:

> We are introducing LRB 4072/2 for first consideration. LRB 4072/2 is a proposed constitutional amendment that would preserve the institution of marriage in this state as it has always been—between a man and a woman.

> Last fall, the Massachusetts Supreme Judicial Court used the Massachusetts State Constitution to completely redefine marriage. . . .

> Nothing in our state constitution presently protects against our State Supreme Court doing the same thing the Massachusetts Supreme Court did in 2003 (or the Vermont Supreme Court did in 1999 or the Hawaii Supreme Court did in 1993, followed up by a state constitutional amendment there) and legislating from the bench to radically alter marriage in this state and judicially impose same-sex marriage on this state. . . .

> This proposal would prevent same-sex marriages from being legalized in this state, regardless of the name used by a court or other body to describe the legal institution. The proposal preserves "marriage" as it has always been in this state, as a union between one man and one woman. In addition, the proposal states that a legal status *identical or substantially similar* to that of marriage for unmarried individuals shall not be valid in this state, regardless of what creative term is used . . . .

[23] Five other state supreme courts have addressed similar questions regarding similarly worded marriage amendments

30

■

¶ 56. To conclude, the two propositions contained in the marriage amendment plainly relate to the subject of marriage. And as the text of the amendment and context of its adoption make clear, the general purpose of the marriage amendment is to preserve the legal status of marriage in Wisconsin as between only one man and one woman. Both propositions in the marriage amendment relate to and are connected with this purpose. Therefore, the marriage amendment does not violate the separate amendment rule of Article XII, Section 1 of the Wisconsin Constitution. Rather, the marriage amendment was adopted by the people of Wisconsin using the process prescribed by the constitution, and is properly now part of our constitution.

## IV. CONCLUSION

¶ 57. In summary, though the precise nature of McConkey's alleged injury is difficult to define, we conclude that the policy considerations underlying our standing doctrine support addressing the merits of · McConkey's claim, which we therefore choose to do.

¶ 58. We hold that Article XIII, Section 13 of the Wisconsin Constitution—the marriage amendment— was adopted in conformity with the separate amendment rule in Article XII, Section 1 of the Wisconsin Constitution, which mandates that voters must be able

and challenges under their own separate amendment rules. All have reached the same result we do here. *See Arizona Together v. Brewer*, 149 P.3d 742 (Ariz. 2007); *Advisory Opinion to the Attorney General re Florida Marriage Prot. Amendment*, 926 So. 2d 1229 (Fla. 2006); *Perdue v. O'Kelley*, 632 S.E.2d 110 (Ga. 2006); *Forum for Equality PAC v. McKeithen*, 893 So. 2d 715 (La. 2005); *Albano v. Attorney General*, 769 N.E.2d 1242 (Mass. 2002).

to vote separately on separate amendments. Both sentences of the marriage amendment relate to marriage and tend to effect or carry out the same general purpose of preserving the legal status of marriage in Wisconsin as between only one man and one woman.

*By the Court.*—The judgment and order of the circuit court are affirmed.